# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 6, 2017        Decided June 13, 2017
                                       Amended August 4, 2017

No. 15-1461

GLOBAL TEL*LINK,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

CENTURYLINK PUBLIC COMMUNICATIONS, INC., ET AL.,
INTERVENORS

———

Consolidated with 15-1498, 16-1012, 16-1029, 16-1038,
16-1046, 16-1057

———

On Petitions for Review of an Order of
the Federal Communications Commission

———

*Mithun Mansinghani*, Deputy Solicitor General, Office of the Attorney General for the State of Oklahoma, argued the cause for State and Local Government Petitioners. With him on the briefs were *E. Scott Pruitt*, Attorney General, *Patrick R. Wyrick*, Solicitor General, *Nathan B. Hall*, Assistant Solicitor General, *James Bradford Ramsay*, *Jennifer Murphy*, *Christopher J. Collins*, *Mark Brnovich*, Attorney General, Office of the Attorney General for the State of Arizona, *Dominic E. Draye*, Deputy Solicitor General, *Leslie Rutledge*, Attorney General, Office of the Attorney General for the State of Arkansas, *Lee Rudofsky*, Solicitor General, *Nicholas Bronni*, Deputy Solicitor General, *Danny Honeycutt*, *Karla L. Palmer*, *Tonya J. Bond*, *Joanne T. Rouse*, *Derek Schmidt*, Attorney General, Office of the Attorney General for the State of Kansas, *Jeffrey A. Chanay*, Chief Deputy Attorney General, *Chris Koster*, Attorney General, Office of the Attorney General for the State of Missouri, *J. Andrew Hirth*, Deputy General Counsel, *Brad D. Schimel*, Attorney General, Office of the Attorney General for the State of Wisconsin, *Misha Tseytlin*, Solicitor General, *Daniel P. Lennington*, Deputy Solicitor General, *Gregory F. Zoeller*, Attorney General, Office of the Attorney General for the State of Indiana, *Thomas M. Fisher*, Solicitor General, *Jeff Landry*, Attorney General, Office of the Attorney General for the State of Louisiana, *Patricia H. Wilton*, Assistant Attorney General, *Adam Paul Laxalt*, Attorney General, Office of the Attorney General for the State of Nevada, and *Lawrence VanDyke*, Solicitor General. *Jared Haines*, Assistant Solicitor General, Office of the Attorney General for the State of Oklahoma, *David G. Sanders*, Assistant Attorney General, Office of the Attorney General for the State of Louisiana, and *Dean J. Sauer*, Attorney, Office of the Attorney General for the State of Missouri, entered appearances.

*Michael K. Kellogg* argued the cause for ICS Carrier Petitioners. With him on the briefs were *Aaron M. Panner*, *Benjamin S. Softness*, *Stephanie A. Joyce*, *Andrew D. Lipman*, *Brita D. Strandberg*, *Jared P. Marx*, *John R. Grimm*, *Robert A. Long, Jr.*, *Kevin F. King*, *Marcus W. Trathen*, *Julia C. Ambrose*, and *Timothy G. Nelson*.

*Andrew D. Lipman* and *Stephanie A. Joyce* were on the brief for petitioner Securus Technologies, Inc.

*David M. Gossett*, Attorney, Federal Communications Commission, argued the cause for respondent. On the brief were *Howard J. Symons* at the time the brief was filed, General Counsel, *Jacob M. Lewis*, Associate General Counsel, *Sarah E. Citrin*, Counsel, and *Robert B. Nicholson* and *Daniel E. Haar*, Attorneys, U.S. Department of Justice. *Mary H. Wimberly*, Attorney, U.S. Department of Justice, *Brendan T. Carr*, Acting General Counsel, Federal Communications Commission, and *Richard K. Welch*, Deputy Associate General Counsel, entered appearances.

*Lori Swanson*, Attorney General, Office of the Attorney General for the State of Minnesota, *Kathryn Fodness* and *Andrew Tweeten*, Assistant Attorneys General, *Eric T. Schneiderman*, Attorney General, Office of the Attorney General for the State of New York, *Robert W. Ferguson*, Attorney General, Office of the Attorney General for the State of Washington, *Karl A. Racine*, Attorney General, Office of the Attorney General for the District of Columbia, *Lisa Madigan*, Attorney General, Office of the Attorney General for the State of Illinois, *Maura Healey*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, and *Hector Balderas*, Attorney General, Office of the Attorney General for the State of New Mexico were on the brief for

*amici curiae* State of Minnesota, et al. in support of respondents.

*Glenn S. Richards* was on the brief for intervenors Network Communications International Corp. in support of respondents.

*Andrew Jay Schwartzman* argued the cause for intervenors The Wright Petitioners. With him on the brief was *Drew T. Simshaw*.

*Danny Y. Chou* was on the brief for amicus curiae The County of Santa Clara and the County of San Francisco in support of respondent.

Opinion for the court filed by *Senior Circuit Judge* EDWARDS.

Concurring opinion filed by *Senior Circuit Judge* SILBERMAN.

Opinion filed by *Circuit Judge* PILLARD, dissenting as to Sections II.B through II.F and concurring in part.

Before: PILLARD, *Circuit Judge*, and EDWARDS and SILBERMAN, *Senior Circuit Judges*.

EDWARDS, *Senior Circuit Judge*: The Communications Act of 1934 ("1934 Act") authorized the Federal Communications Commission ("Commission" or "FCC") to ensure that interstate telephone rates are "just and reasonable," 47 U.S.C. § 201(b), but left regulation of intrastate rates primarily to the states. In the Telecommunications Act of 1996 ("1996 Act"), Congress amended the 1934 Act to change the Commission's limited regulatory authority over intrastate

telecommunication so as to promote competition in the payphone industry.

Before the passage of the 1996 Act, Bell Operating Companies ("BOCs") had dominated the payphone industry to the detriment of other providers. Congress sought to remedy this situation by authorizing the Commission to adopt regulations ensuring that all payphone providers are "fairly compensated for each and every" interstate and intrastate call. 47 U.S.C. § 276(b)(1)(A). "[P]ayphone service" expressly includes "the provision of inmate telephone service in correctional institutions, and any ancillary services." *Id.* § 276(d). The issues in this case focus on inmate calling services ("ICS") and the rates and fees charged for these calls.

Following the passage of the 1996 Act, the Commission avoided intrusive regulatory measures for ICS. And prior to the *Order* under review in this case, the Commission had never sought to impose rate caps on intrastate calls. Rather, the FCC consistently construed its authority over intrastate payphone rates as limited to addressing the problem of under-compensation for ICS providers.

Due to a variety of market failures in the prison and jail payphone industry, however, inmates in correctional facilities, or those to whom they placed calls, incurred prohibitive per-minute charges and ancillary fees for payphone calls. In the face of this problem, the Commission decided to change its approach to the regulation of ICS providers. In 2015, in the *Order* under review, the Commission set permanent rate caps and ancillary fee caps for interstate ICS calls and, for the first time, imposed those caps on intrastate ICS calls. *Rates for Interstate Inmate Calling Services* ("*Order*"), 30 FCC Rcd. 12763, 12775–76, 12838–62 (Nov. 5, 2015), 80 Fed. Reg. 79136-01 (Dec. 18, 2015). The Commission also proposed to

expand the reach of its ICS regulations by banning or limiting fees for billing and collection services – so-called "ancillary fees" – and by regulating video services and other advanced services in addition to traditional calling services.

Five inmate payphone providers, joined by state and local authorities, now challenge the *Order*'s design to expand the FCC's regulatory authority. In particular, the Petitioners challenge the *Order*'s proposed caps on intrastate rates, the exclusion of "site commissions" as costs in the agency's ratemaking methodology, the use of industry-averaged cost data in the FCC's calculation of rate caps, the imposition of ancillary fee caps, and reporting requirements. And one ICS provider separately challenges the Commission's failure to preempt inconsistent state rates and raises a due process challenge.

Following the presidential inauguration in January 2017, counsel for the FCC advised the court that, due to a change in the composition of the Commission, "a majority of the current Commission does not believe that the agency has the authority to cap intrastate rates under section 276 of the Act." Counsel thus informed the court that the agency was "abandoning . . . the contention . . . that the Commission has the authority to cap intrastate rates" for ICS providers. Counsel also informed the court that the FCC was abandoning its contention "that the Commission lawfully considered industry-wide averages in setting the rate caps." However, the Commission has not revoked, withdrawn, or suspended the *Order*. And one of the Intervenors on behalf of the Commission, the "Wright Petitioners," continues to press the points that have been abandoned by the Commission.

For the reasons set forth below, we grant in part and deny in part the petitions for review, and remand for further

proceedings with respect to certain matters. We also dismiss two claims as moot.

- We hold that the *Order*'s proposed caps on *intrastate* rates exceed the FCC's statutory authority under the 1996 Act. We therefore vacate this provision.

- We further hold that the use of industry-averaged cost data as proposed in the *Order* is arbitrary and capricious because it lacks justification in the record and is not supported by reasoned decisionmaking. We therefore vacate this provision.

- We additionally hold that the *Order*'s imposition of video visitation reporting requirements is beyond the statutory authority of the Commission. We therefore vacate this provision.

- We find that the *Order*'s proposed wholesale exclusion of site commission payments from the FCC's cost calculus is devoid of reasoned decisionmaking and thus arbitrary and capricious. This provision cannot stand as presently proposed in the *Order* under review; we therefore vacate this provision and remand for further proceedings on the matter.

- We deny the petitions for review of the *Order*'s site commission reporting requirements.

- We remand the challenge to the *Order*'s imposition of ancillary fee caps to allow the Commission to determine whether it can segregate proposed caps on interstate calls (which are permissible) and the proposed caps on intrastate calls (which are impermissible).

- Finally, we dismiss the preemption and due process claims as moot.

## I.   BACKGROUND

### A.  Statutory Background

The 1934 Act, 47 U.S.C. § 151, *et seq.*, established a system of regulatory authority that divides power between individual states and the FCC over inter- and intrastate telephone communication services. *New England Pub. Commc'ns Council, Inc. v. FCC*, 334 F.3d 69, 75 (D.C. Cir. 2003). Under this statutory scheme, the Commission regulates interstate telephone communication. *See id.*; 47 U.S.C. § 151. This regulatory authority includes ensuring that all charges "in connection with" interstate calls are "just and reasonable." 47 U.S.C. § 201(b). "The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out" these provisions. *Id.*

The FCC, however, "is generally forbidden from entering the field of intrastate communication service, which remains the province of the states." *New England Pub.*, 334 F.3d at 75 (citing 47 U.S.C. § 152(b)). Section 152(b) of the 1934 Act erects a presumption against the Commission's assertion of regulatory authority over intrastate communications. This is "not only a substantive jurisdictional limitation on the FCC's power, but also a rule of statutory construction" in interpreting the Act's provisions. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 373 (1986).

The 1996 Act "fundamentally restructured the local telephone industry," *New England Pub.*, 334 F.3d at 71, by changing the FCC's authority with respect to some intrastate activities and "remov[ing] a significant area from the States'

exclusive control," *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 382 n.8 (1999). Nevertheless, the states still primarily "reign supreme over intrastate rates." *New England Pub.*, 334 F.3d at 75 (quoting *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1155 (D.C. Cir. 1987)). "Insofar as Congress has remained silent . . . § 152(b) continues to function. The Commission could not, for example, regulate any aspect of intrastate communication *not* governed by the 1996 Act on the theory that it had an ancillary effect on matters within the Commission's primary jurisdiction." *AT&T Corp.*, 525 U.S. at 382 n.8.

Although the strictures of § 152 remain in force, the changes imposed by the 1996 Act were significant. Evidence of this is seen in the "Special Provisions Concerning Bell Operating Companies." 47 U.S.C. §§ 271–76. Section 276 was "specifically aimed at promoting competition in the payphone service industry." *New England Pub.*, 334 F.3d at 71. While local phone services were once thought to be natural monopolies, "[t]echnological advances . . . made competition among multiple providers of local service seem possible, and Congress [in the 1996 Act] ended the longstanding regime of state-sanctioned monopolies." *AT&T Corp.*, 525 U.S. at 371; *see also Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 50 (2007).

The market history is illuminating. After AT&T had divested its local exchange carriers into individual BOCs in 1982, BOCs continued to discriminate against non-BOC payphone providers and effectively foreclosed competition. The BOCs accomplished this by generally making sure that other providers were not compensated for calls using BOC-owned payphone lines. *See New England Pub.*, 334 F.3d at 71. Thus, because technology constraints forced many non-BOC providers to use BOC-owned payphone lines, those providers

were often left uncompensated for payphone calls. The 1996 Act changed these market practices.

In § 276, Congress clearly aimed to "promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public." 47 U.S.C. § 276(b)(1). Covered payphone services include "inmate telephone service in correctional institutions, and any ancillary services." *Id.* § 276(d). Section 276 of the 1996 Act authorizes the Commission "to prescribe regulations consistent with the goal of promoting competition, requiring that the Commission take five specific steps toward that goal." *New England Pub.*, 334 F.3d at 71. One such step is to "establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone," and to prescribe regulations to establish this compensation plan by November 1996. 47 U.S.C. § 276(b)(1), (b)(1)(A). The remaining four steps further encourage or force competition between BOC and non-BOC providers. *Id.* § 276(b)(1)(B)–(E). Any state requirements that are inconsistent with FCC's regulations adopted pursuant to § 276 are preempted. *Id.* § 276(c).

## B.  Factual and Procedural Background

Over the years, payphone providers have sought to provide inmate calling services to inmates in prisons and jails nationwide. ICS providers now compete with one another to win bids for long-term ICS contracts with correctional facilities. In awarding contracts to providers, correctional facilities usually give considerable weight to which provider offers the highest site commission, which is typically a portion of the provider's revenue or profits. *See Implementation of Pay Tel. Reclassification & Comp. Provisions of Telecomms. Act of*

*1996*, 17 FCC Rcd. 3248, 3252–53 (2002). Site commissions apparently range between 20% and 63% of the providers' profits, but can exceed that amount. *Id.* at 3253 n.34. And ICS providers pay over $460 million in site commissions annually. *Order*, 30 FCC Rcd. at 12821.

Once a long-term, exclusive contract bid is awarded to an ICS provider, competition ceases for the duration of the contract and subsequent contract renewals. Winning ICS providers thus operate locational monopolies with a captive consumer base of inmates and the need to pay high site commissions. *See* 17 FCC Rcd. at 3253. After a decade of industry consolidation, three specialized ICS firms now control 85% of the market. *Order*, 30 FCC Rcd. at 12801. And ICS per-minute rates and ancillary fees together are extraordinarily high, with some rates as high as $56.00 for a four-minute call. *Id.* at 12765 n.4.

In reviewing this market situation, the FCC found that inmate calling services are "a prime example of market failure." *Id.* at 12765. In its brief to this court, FCC counsel aptly explains the seriousness of the situation:

> Inmates and their families cannot choose for themselves the inmate calling provider on whose services they rely to communicate. Instead, correctional facilities each have a single provider of inmate calling services. And very often, correctional authorities award that monopoly franchise based principally on what portion of inmate calling revenues a provider will share with the facility—*i.e.*, on the payment of "site commissions." Accordingly, inmate calling providers compete to offer the highest site commission payments, which they recover through correspondingly higher end-user rates. *See* [*Order*, 30

FCC Rcd. at 12818–21]. If inmates and their families wish to speak by telephone, they have no choice but to pay the resulting rates.

Br. for FCC at 4.

In February 2000, Intervenor Martha Wright filed a putative class action against ICS providers on behalf of her grandson, other inmates, and their loved ones to challenge ICS rates and fees. Complaint, *Wright, et al. v. Corr. Corp. of Am.*, No. 1:00-CV-00293 (D.D.C. Feb. 16, 2000). In 2001, the District Court stayed the case to afford the FCC the opportunity to consider the reasonableness of ICS rates in the first instance through rulemaking. Thereafter, in 2003 and in 2007, Martha Wright and others petitioned the Commission for rulemaking to regulate ICS rates and fees. *Petition for Rulemaking*, FCC No. 96-128 (Nov. 3, 2003); *Petitioners' Alternative Rulemaking Proposal*, FCC No. 96-128 (Mar. 1, 2007).

The record compiled by the Commission fairly clearly supports its determination that ICS charges raise serious concerns. As noted in the FCC's brief to the court:

Excessive rates for inmate calling deter communication between inmates and their families, with substantial and damaging social consequences. Inmates' families may be forced to choose between putting food on the table or paying hundreds of dollars each month to keep in touch. *See* [*Order*, 30 FCC Rcd. at 12766–67]. When incarcerated parents lack regular contact with their children, those children—2.7 million of them nationwide—have higher rates of truancy, depression, and poor school performance. *See* [*id.* at 12766–67 & 12767 n.18]. Barriers to communication from high inmate calling rates interfere with inmates'

ability to consult their attorneys, *see* [*id.* at 12765], impede family contact that can "make[] prisons and jails safer spaces," [*id.* at 12767], and foster recidivism, *see* [*id.* at 12766–67].

Br. for FCC at 4–5. Petitioners do not seriously contest these facts. *See* Joint Br. for Pet'rs at 7 (acknowledging that "calling rates often exceed, sometimes substantially, rates for ordinary toll calls").

In 2013, the Commission issued an interim order imposing a per-minute rate cap for interstate ICS calls, citing its plenary authority over interstate calls under § 201(b) and its mandate to ensure that providers are "fairly compensated" under § 276. *Rates for Interstate Inmate Calling Services* ("*Interim Order*"), 28 FCC Rcd. 14107, 14114–15 (2013). ICS providers petitioned for this court's review of the *Interim Order*. The court stayed application of certain portions of the *Interim Order* but allowed its interstate rate caps to remain in effect. Order, *Securus Techs. v. FCC*, No. 13-1280 ("*Securus I*") (D.C. Cir. Jan. 13, 2014), ECF No. 1474764 (staying only 47 C.F.R. §§ 64.6010, 64.6020, and 64.6060). In December 2014, the court held the petitions in abeyance while the Commission proceeded to set permanent rates. Order, *Securus I* (D.C. Cir. Dec. 16, 2014), ECF No. 1527663.

In 2015, the Commission set permanent rate caps and ancillary fee caps for interstate ICS calls, and for the first time the agency imposed caps on intrastate ICS calls. *Order*, 30 FCC Rcd. at 12775–76, 12838–62. The rate caps were set for four categories – "all prisons" and three tiers of jails based on size – and the rate caps varied by category. *Id.* at 12770. The rate caps, which were made effective immediately, ranged from $.14 to $.49 per minute, but were to decrease as of July 1, 2018, to $.11 to $.22 per minute. *Id.* In setting the rate caps, the

Commission used a ratemaking methodology based on industry-average cost data that excluded site commissions as a cost. *Id.* at 12790, 12818–38. The *Order* also imposed reporting requirements on ICS providers, including for video visitation services and site commissions. *Id.* at 12890–93.

ICS providers Global Tel\*Link; Securus Technologies, Inc.; CenturyLink Public Communications, Inc.; Telmate, LLC; and Pay Tel Communications ("Pay Tel") (collectively "Petitioners") separately petitioned for review. Various state and local correctional authorities, governments, and correctional facility organizations petitioned and/or intervened on behalf of Petitioners. Martha Wright's putative class and various inmate-related legal organizations ("Intervenors") intervened on behalf of the Commission.

In early 2016, the court consolidated the petitions for review. On March 7, 2016, the court stayed the application of the *Order*'s rate caps and ancillary fee caps as to single-call services while this case was pending. Order, *Global Tel\*Link, et al. v. FCC*, No. 15-1461 ("*Global Tel\*Link*") (D.C. Cir. Mar. 7, 2016), ECF No. 1602581. Subsequently, on March 23, 2016, the court stayed the application of the *Interim Order* to intrastate rates. Order, *Global Tel\*Link* (D.C. Cir. Mar. 23, 2016), ECF No. 1605455.

In August 2016, on reconsideration of the FCC's *Order*, the Commission raised the rate caps to account for a small portion of site commissions. *Rates for Interstate Inmate Calling Services* ("*Reconsideration Order*"), 31 FCC Rcd. 9300 (2016). ICS providers petitioned for review of the *Reconsideration Order*, but the court held those petitions in abeyance and stayed the *Reconsideration Order* pending the outcome of this case. *See* Order, *Securus Techs. v. FCC*, No.

16-1321 ("*Securus II*") (D.C. Cir. Nov. 2, 2016), ECF No. 1644302.

On January 31, 2017, counsel for the FCC filed a letter advising this court that the Commission had experienced "significant changes in [its] composition." Letter at 1, *Global Tel\*Link* (D.C. Cir. Jan. 31, 2017), ECF No. 1658521. Of the five Commissioners who had voted on the *Order*, two of the three Commissioners in the majority had left the FCC. *Id.* Because the dissent's position now commanded a majority, counsel for the FCC informed the court that "a majority of the current Commission does not believe that the agency has the authority to cap intrastate rates under section 276 of the Act." *Id.* Counsel thus advised the court that the FCC was "abandoning . . . the contention . . . that the Commission has the authority to cap intrastate rates" for ICS. *Id.* Counsel additionally informed the court that the FCC was abandoning its contention "that the Commission lawfully considered industry-wide averages in setting the rate caps." *Id.* at 2. At oral argument, counsel for the Commission confirmed the agency's abandonment of these aspects of the *Order*. Tr. of Oral Argument at 43–45, *Global Tel\*Link* (D.C. Cir. Feb. 6, 2017), ECF No. 1666379.

## II.  ANALYSIS

### A.  The Posture of this Case

The current posture of this case is unusual because counsel for the FCC has advised the court that the agency will not oppose two of the principal challenges raised by Petitioners regarding: (1) the authority of the FCC to set permanent rate caps and ancillary fee caps for intrastate ICS calls; and (2) the legality of the Commission's consideration of industry-wide averages in setting rate caps. In light of the FCC's change of

position, a question arises as to whether these challenges are moot.

It is well established that "voluntary cessation of allegedly illegal conduct does not deprive [a judicial] tribunal of power to hear and determine the case, *i.e.*, does not make the case moot." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953). As the Court explained:

> A controversy may remain to be settled in such circumstances, *e.g.*, a dispute over the legality of the challenged practices. The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion. For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right. The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement.

*Id*. at 632 (citations omitted).

"Voluntary cessation" justifies the dismissal of a case on grounds of mootness only when "the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated. The burden is a heavy one." *Id.* at 633 (citation and internal quotation marks omitted); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("[T]he standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: 'A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be

expected to start up again lies with the party asserting mootness." (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968))); *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491–92 (D.C. Cir. 1988) (same).

There is absolutely no basis for dismissing as moot the claims relating to the issues that the FCC has "abandoned." Indeed, neither the FCC, the Petitioners, nor the Intervenors have urged this. The reason is fairly simple: the *Order* that gave rise to the petitions for review is still in force. Although counsel for the FCC has made it clear that the agency will not defend portions of the *Order*, the Commission has never acted to revoke, withdraw, or suspend the *Order*. Given this posture of the case, it is plain that there has been no "voluntary cessation" by the FCC that would warrant dismissal of Petitioners' challenges to the *Order*.

## B.   Standard of Review

Although Petitioners' challenges to the provisions of the *Order* purporting to cap intrastate rates and to apply industry-wide averages in setting rate caps are not moot, a question remains as to what standard governs our review of these provisions. Normally, we would follow the familiar two-step *Chevron* framework as the appropriate standard of review. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Under the *Chevron* framework,

> an agency's power to regulate "is limited to the scope of the authority Congress has delegated to it." *Am. Library Ass'n v. FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005). Pursuant to *Chevron* Step One, if the intent of Congress is clear, the reviewing court must give effect to that unambiguously expressed intent. If Congress

has not directly addressed the precise question at issue, the reviewing court proceeds to *Chevron* Step Two. Under Step Two, "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are . . . manifestly contrary to the statute." *Chevron*, 467 U.S. at 843–44. Where a "legislative delegation to an agency on a particular question is implicit rather than explicit," the reviewing court must uphold any "reasonable interpretation made by the administrator of [that] agency." *Id.* at 844. But deference to an agency's interpretation of its enabling statute "is due only when the agency acts pursuant to delegated authority." *Am. Library Ass'n*, 406 F.3d at 699.

EDWARDS, ELLIOTT, AND LEVY, FEDERAL STANDARDS OF REVIEW 166–67 (2d ed. 2013).

The disputed *Order* in this case was promulgated by the FCC "carrying the force of law." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). Therefore, it was presumptively subject to review pursuant to *Chevron*. *Id.* The oddity here, however, is that the agency no longer seeks deference for the parts of the *Order* purporting to cap intrastate rates for ICS providers and to apply industry-wide averages in setting the rate caps. In these circumstances, it would make no sense for this court to determine whether the disputed agency positions advanced in the *Order* warrant *Chevron* deference when the agency has abandoned those positions.

Although the *Chevron* framework is of no significance with respect to the cap on intrastate rates and the application of industry-wide averages issues, this does not affect the court's

jurisdiction to address these issues. *See, e.g.*, *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 679–83 (2010) (deciding the statutory issue without reference to the *Chevron* framework). Therefore, "[w]ith *Chevron* inapplicable, . . . 'we must decide for ourselves the best reading'" of the statutory provisions at issue in this case. *Miller v. Clinton*, 687 F.3d 1332, 1342 (D.C. Cir. 2012) (quoting *Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1136 (D.C. Cir. 2001)).

It is well recognized that when a disputed agency interpretation does not carry the force of law, it still may be "entitled to respect," at least to the extent that the interpretation has the "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also Mead*, 533 U.S. at 227–31; *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000). However, in this case, because the FCC now offers *no* interpretations in support the provisions of the *Order* purporting to cap intrastate rates for ICS providers and apply industry-wide averages in setting the rate caps, the court must resolve these issues applying the usual rules of statutory construction. *See, e.g.*, *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994); *see generally* ROBERT A. KATZMANN, JUDGING STATUTES (2014); WILLIAM N. ESKRIDGE, JR., ABBE R. GLUCK & VICTORIA F. NOURSE, STATUTES, REGULATION, AND INTERPRETATION 409–29 (2014).

With respect to the remaining issues before the court, we will apply the *Chevron* framework, as applicable. As to all other issues, we will apply § 706(2)(A) of the Administrative Procedure Act ("APA"), which provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard of review, we search for

"reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 52 (1983). This means that we must determine whether the FCC "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 43 (internal quotation marks omitted).

## C. The Authority of the FCC to Set Permanent Rate Caps and Ancillary Fee Caps for Intrastate ICS Calls

In the disputed *Order*, the Commission asserted authority to impose rate caps on intrastate ICS calls for the first time. It did so under the guise of § 276 of the 1996 Act, which requires the Commission to "establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone," and to prescribe regulations to establish this compensation plan. 47 U.S.C. § 276(b)(1), (b)(1)(A). Petitioners assert that the provision in § 276, requiring the Commission to ensure that ICS providers are "fairly compensated," does not override the command of § 152(b), which forbids the FCC from asserting jurisdiction over "charges, classifications, practices, services, facilities, or regulations for or in connection with *intrastate* communication service." 47 U.S.C. § 152(b) (emphasis added). Petitioners also contend that § 276 does not give the Commission ratemaking authority comparable to the authority that it has under § 201 to regulate and cap *interstate* rates. Finally, Petitioners point out that the intrastate rate caps prescribed in the *Order* make little sense in light of the undisputed record evidence showing that many ICS providers have costs that are higher than the disputed rate caps. We agree with Petitioners that, on the record in this case, § 276 did not authorize the Commission to impose

intrastate rate caps as prescribed in the *Order*. Several considerations have influenced our judgment on this matter.

*First*, as noted above, § 152(b) of the 1934 Act erects a presumption against the Commission's assertion of regulatory authority over *intrastate* communications. *La. Pub. Serv. Comm'n*, 476 U.S. at 373 (making it clear that this is "not only a substantive jurisdictional limitation on the FCC's power, but also a rule of statutory construction" in interpreting the Act's provisions). As we explain below, the *Order* in this case does not come close to overcoming this presumption in proposing to cap intrastate rates.

*Second*, the *Order* erroneously treats the Commission's authority under § 201 and § 276 as coterminous. Section 201 imbues the Commission with traditional ratemaking powers over *interstate* calls, including the imposition of rate caps. The statute explicitly directs the FCC to ensure that *interstate* rates are "just and reasonable," and to "prescribe such rules and regulations as may be necessary in the public interest" to carry out these provisions. 47 U.S.C. § 201(b). Section 276, however, does not give the Commission authority to determine "just and reasonable" rates. Rather, § 276 merely directs the Commission to "ensure that all [ICS] providers are fairly compensated" for their inter- and intrastate calls. 47 U.S.C. § 276(b)(1)(A).

The language and purpose of § 201 in the 1934 Act are fundamentally different from the language and purpose of § 276 in the 1996 Act. The *Order* glosses over these differences in declaring that the Commission has authority to ensure that rates are "just, reasonable and fair." *See, e.g.*, *Order*, 30 FCC Rcd. at 12766, 12817. This is not what § 201(b) and § 276 say. And once the *Order* misquotes the language of § 201(b) and § 276, it goes on to conclude that these provisions in their combined effect authorize the FCC to set rate caps to ensure

that both *inter-* and *intrastate* rates are "'just and reasonable' and do not take unfair advantage of inmates, their families, or providers consistent with the 'fair compensation' mandate of section 276." *Id.* at 12817. In other words, in ignoring the terms of § 276, the *Order* conflates two distinct statutory grants of authority into a synthetic "just, reasonable and fair" standard. This is impermissible.

*Third*, the *Order* asserts that the Commission "has previously found that the term 'fairly compensated' [in § 276] permits a range of compensation rates . . ., but that the interests of both the payphone service providers and the parties paying the compensation must be taken into account," implying considerations of fairness to the consumer. *Id.* at 12814 n.335. This assertion is unfounded. The truth is that the Commission's prior orders align with a narrow reading of the statute that does not purport to treat the Commission's authority under § 201 and § 276 as coterminous. The FCC's prior orders to which the *Order* here refers construed the "fairly compensated" mandate of § 276 as irrelevant to ICS rates reached through contractual bargaining. This was because the FCC had determined that "whenever a [payphone provider] is able to negotiate for itself the terms of compensation for the calls its payphones originate, then [the Commission's] statutory obligation to provide fair compensation is satisfied." *Implementation of the Pay Tel. Reclassification & Comp. Provisions of the Telecomms. Act of 1996*, 11 FCC Rcd. 21233, 21269 (1996). This is hardly evidence of "just, reasonable and fair" ratemaking under § 276.

Furthermore, it is noteworthy that the Commission's prior orders repeatedly acknowledge that § 276 focuses on the problem of uncompensated calls in situations in which BOC providers engaged in anti-competitive behavior. In other words, the FCC recognized that a principal reason for the enactment of § 276 was to address "the limitation on the ability

of [payphone providers] and carriers to negotiate a mutually agreeable amount" because of technological and regulatory constraints. *Implementation of the Pay Tel. Reclassification & Comp. Provisions of the Telecomms. Act of 1996*, 14 FCC Rcd. 2545, 2551, 2569 (1999). Therefore, the prior orders to which the *Order* at issue here refers focused on payphone providers and carriers to determine whether the providers were fairly compensated. *See, e.g.*, *id.* at 2570; *Implementation of Pay Tel. Reclassification & Comp. Provisions of Telecomms. Act of 1996*, 17 FCC Rcd. 21274, 21302 (2002) (referring to providers and the carriers compensating the providers in stating that § 276 "implies fairness to both sides"). The prior orders did not reflect anything approaching "just, reasonable and fair" ratemaking for *intrastate* rates as authorized by § 201 for *interstate* rates.

In the agency brief that was filed with the court before the FCC abandoned its support of the intrastate rate caps, counsel argued that fairness to the consumer is implied in § 276 because the reference to "fair" (in "fairly compensated") is "capacious." Br. for FCC at 31. This argument finds no support in the *Order*. As noted above, the *Order* simply asserts that intrastate rate caps are consistent with the Commission's past orders. And, as noted above, the Commission's past orders do not support a "capacious" interpretation of "fairly compensated" in § 276 to suggest that it is comparable to "just, reasonable and fair" ratemaking in § 201. The prior orders merely relied on the "fairly compensated" language to set a default rate from which the payphone providers and carriers could negotiate a departure, not to reduce bargained-for compensation. *See, e.g.*, 11 FCC Rcd. at 21267–69; 14 FCC Rcd. at 2569–71. The Commission made it clear that it meant to "g[i]ve primary importance to Congress's objective of establishing a market-based, deregulatory mechanism for payphone compensation, as

required both in section 276 and the generally pro-competitive goals of the 1996 Act." 14 FCC Rcd. at 2548.

*Finally*, the *Order* cites two decisions of this court to justify an interpretation of the "fair compensation" mandate in § 276 that includes "just and reasonable" ratemaking in § 201. *Order*, 30 FCC Rcd. at 12815–16 (citing *Ill. Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 562 (D.C. Cir. 1997); *New England Pub.*, 334 F.3d at 75). The *Order*'s construction of these decisions is misguided because neither decision compels the conclusion that § 276 authorizes the Commission to cap *intrastate* rates pursuant to "just, reasonable and fair" ratemaking.

The *Order* first extracts language from the decision in *Illinois* saying that § 276 provides the Commission with "authority to set local coin call rates." 117 F.3d at 562. But in the order under review in *Illinois*, the FCC did not "set" local coin call rates by imposing caps on intrastate rates. Rather, the agency merely interpreted the mandate of § 276(b)(1)(A) to "require[] the Commission to act only with respect to those types of calls for which a [payphone provider] *does not already receive fair compensation*." *Id.* at 559 (emphasis added). And even for those calls, the FCC ultimately determined a default floor based on the deregulated market rate and allowed the payphone providers to negotiate a departure from that rate. *Id.* at 560.

In reviewing the FCC's order that was contested in *Illinois*, we held that § 276 unambiguously overrode § 152(b)'s presumption against intrastate jurisdiction insofar as it granted the Commission authority to "set" reimbursement rates for local coin calls in order to ensure that payphone operators who were previously uncompensated were "fairly compensated." *Id.* at 561–63. The court did not say that § 276 overrode the presumption against intrastate jurisdiction to allow the

Commission to *reduce* already compensatory rates, which is what the *Order* at issue in this case suggests. Rather, the *Illinois* court said:

> If locational monopolies turn out to be a problem, however, the Commission suggested some ways in which it might deal with them: a State might be permitted to require competitive bidding for locational contracts, or to mandate that additional [payphone providers] be allowed to provide payphones at the location; and if these remedies fail, the Commission may consider the matter further.

*Id.* at 562–63. None of these options contemplated caps on intrastate rates.

It is true that the decision in *Illinois* does not explicitly preclude the Commission from imposing intrastate rate caps. That was not the question before the court. But the *Order* at issue in this case is wrong in suggesting that the decision in *Illinois* reflects "significant judicial precedent [that] supports the Commission's authority" to *reduce* already compensatory rates. *Order*, 30 FCC Rcd. at 12815. Indeed, in *Illinois* the court reversed the Commission's decision to exclude certain uncompensated calls from its mandatory compensation plan because the failure to provide compensation for this type of payphone call was "patently inconsistent with § 276's command that fair compensation be provided for 'each and every completed . . . call.'" 117 F.3d at 566.

The *Order* at issue in this case also purports to rely on a statement in the *New England* decision that § 276 "unambiguously and straightforwardly authorizes the Commission to regulate . . . intrastate payphone line rates." *Order* at 12815 (quoting *New England Pub.*, 334 F.3d at 75).

But here again the cited decision merely confirmed that the 1996 Act expanded the Commission's intrastate regulatory authority within the limited parameters of § 276. The *New England* court held that Congress had authorized the Commission to carry out the anti-subsidy and anti-discrimination mandates of § 276(b)(1)(D)–(E) as to both inter- and intrastate payphone providers because Congress intended § 276 as a whole to "authorize the Commission to eliminate barriers to competition." 334 F.3d at 77. But when pressed to extend § 276's anti-subsidy and anti-discrimination mandates to non-BOC carriers, the court said, "the fact remains that sections 276(a) and 276(b)(1)(C), the sources of the Commission's authority to regulate intrastate payphone rates, expressly apply only to the BOCs." *Id.* at 78. The court was also clear in saying that outside the specific directives of § 276, general provisions "cannot . . . trump section 152(b)'s specific command that no Commission regulations shall preempt state regulations unless Congress expressly so indicates. Absent authorization to apply its section 276 regulations to non-BOC [carriers], the Commission may not regulate their intrastate payphone line rates." *Id.* (citation omitted).

Thus, neither *Illinois* nor *New England* stands for the proposition that the Commission has broad plenary authority to regulate and cap intrastate rates. Rather these decisions confirm the limited scope of § 276 which must be applied within the express bounds of its specific directives.

The *Order*'s misconstruction of our case law stems from its fundamental misreading of § 276. The *Order* acknowledges that the Commission's authority over intrastate calls is, "except as otherwise provided by Congress, generally limited by section [152(b)] of the Act." *Order*, 30 FCC Rcd. at 12814. The Commission thus recognized that to assert jurisdiction over intrastate rates, the 1996 Act must "unambiguously appl[y] to

intrastate services." *Id.* The *Order* errs, however, in concluding that § 276 required it "to broadly craft regulations to 'promote the widespread development of payphone services for the benefit of the general public,'" and that this constituted a "general grant of jurisdiction." *Id.* (quoting 47 U.S.C. § 276(b)(1)). This misreads the language of § 276. The statute merely commands the Commission, "[i]n order to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public," 47 U.S.C. § 276(b)(1), to prescribe regulations to accomplish "five specific steps toward that goal," *New England Pub.*, 334 F.3d at 71. This is not a "general grant of jurisdiction" over intrastate ratemaking.

The *Order* at issue in this case is legally infirm because it purports to cap intrastate rates based on a "just, reasonable and fair" test that is not enunciated in the statute, conflates distinct grants of authority under § 201 and § 276, and misreads our judicial precedent and the FCC's own prior orders to support capping already compensatory rates under the guise of ensuring providers are "fairly compensated." The point here is straightforward:

> The FCC's belief that lower ICS calling rates reflect desirable social policy cannot justify regulations that exceed its statutory mandate. Section 276 of the Communications Act authorizes the FCC to ensure that ICS providers are not deprived of fair compensation for the use of their payphones; § 201 authorizes it to ensure that rates for and in connection with *interstate* telecommunications services are just and reasonable. The FCC may not ignore these statutory limits to advance its preferred correctional policy.

Joint Br. for Pet'rs at 4.

We therefore reverse and vacate the provision in the *Order* that purports to cap intrastate rates as beyond the statutory authority of the Commission. We need not decide the precise parameters of the Commission's authority under § 276. We simply hold here that the agency's attempted exercise of authority in the disputed *Order* cannot stand.

## D.   The Categorical Exclusion of Site Commission Costs

The Petitioners contend that:

> The FCC's exclusion of site commission payments from the costs used to set ICS rate caps was unlawful. ICS providers are required by state and local governments and correctional institutions to pay site commissions; those commissions are accordingly a cost of providing service like other state taxes and fees that the FCC recognizes as recoverable costs. The FCC acknowledged that, taking site commissions into consideration, the rate caps were below providers' costs. This violates the FCC's obligation to "ensure that all payphone service providers are fairly compensated," 47 U.S.C. § 276(b)(1)(A), § 201's "just and reasonable" requirement, and the Constitution's Takings Clause.

Joint Br. for Pet'rs at 16. The concerns raised by Petitioners are compelling.

The Commission's categorical exclusion of site commissions from the calculus used to set ICS rate caps defies reasoned decisionmaking because site commissions obviously are costs of doing business incurred by ICS providers. Yet, the *Order* categorically excluded site commissions and then "set the rate caps below cost." *Id.* at 20. This is hard to fathom. "An

agency acts arbitrarily or capriciously if it has . . . offered an explanation either contrary to the evidence before the agency or so implausible as not to reflect either a difference in view or agency expertise." *Defs. of Wildlife & Ctr. for Biological Diversity v. Jewell*, 815 F.3d 1, 9 (D.C. Cir. 2016) (citing *State Farm*, 463 U.S. at 43). Ignoring costs that the Commission acknowledges to be legitimate is implausible.

The FCC's suggestion that site commissions "have nothing to do with the provision of ICS," *Order*, 30 FCC Rcd. at 12822 (internal quotation marks omitted), makes no sense in light of the undisputed record in this case. In some instances, commissions are mandated by state statute, *Rates for Interstate Inmate Calling Services*, 27 FCC Rcd. 16629, 16643 (2012), and in other instances commissions are required by state correctional institutions as a condition of doing business with ICS providers, 17 FCC Rcd. at 3252–53. "If agreeing to pay site commissions is a condition precedent to ICS providers offering their services, those commissions are 'related to the provision of ICS.'" Joint Br. for Pet'rs at 21. And it does not matter that the states may use the commissions for purposes unrelated to the activities of correctional facilities. The ICS providers who are required to pay the site commissions as a condition of doing business have no control over the funds once they are paid. None of the other reasons offered by the Commission to justify the categorical exclusion of site commissions passes muster.

On the record before us, we simply cannot comprehend the agency's reasoning. Where, as here, an agency's "explanation for its determination . . . lacks any coherence," we owe "no deference to [the agency's] purported expertise." *Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006); *see also Coburn v. McHugh*, 679 F.3d 924 (D.C. Cir. 2012). Not only does the

FCC's reasoning defy comprehension, the categorical exclusion of site commissions cannot be easily squared with the requirements of § 276 and § 201. We therefore vacate this portion of the *Order*.

In its 2016 *Reconsideration Order*, the Commission raised the rate caps specifically to account for a portion of site commissions, effectively acknowledging that a categorical exclusion of site commissions from the ratemaking calculus is implausible. The Commission said:

> [W]e have decided, out of an abundance of caution, to take a more conservative approach and expressly account for facilities' ICS-related costs when calculating our rate caps. Accordingly, we grant the Hamden Petition in part . . . and increase our interstate and intrastate rate caps to expressly account for reasonable facility costs related to ICS.

*Reconsideration Order*, 31 FCC Rcd. at 9302. Although the FCC purported to change its position in the *Reconsideration Order*, that order does not moot Petitioner's challenge here. *See, e.g.*, *N.E. Fla. Contractors v. Jacksonville*, 508 U.S. 663, 662 (1993) (replacing the challenged law "with one that differs only in some insignificant respect" and "disadvantages [petitioners] in the same fundamental way" does not moot the underlying challenge).

The *Reconsideration Order* is not before us, so we cannot say whether it provides a satisfactory response to Petitioners' challenge. We will leave this for the Commission's consideration on remand. We also leave it to the Commission to assess on remand which portions of site commissions might be directly related to the provision of ICS and therefore legitimate, and which are not. In addition, although we

conclude that the *Order* at issue here is arbitrary and capricious insofar as it categorically excludes site commissions from the ratemaking calculus, we do not reach Petitioners' remaining arguments that the exclusion of site commissions denies ICS providers fair compensation under § 276 and violates the Takings Clause of the Constitution because it forces providers to provide services below cost. These matters should be addressed by the Commission on remand once it revisits the exclusion of site commissions from the ratemaking calculus.

## E. The Legality of the FCC's Use of Industry-Wide Averages in Setting Rate Caps

Petitioners contend that:

> Even if site commissions are disregarded, the rate caps were set too low to ensure compensation "for each and every completed . . . call." [47 U.S.C. § 276(b)(1)(A)]. The FCC's caps are below average costs documented by numerous ICS providers and would deny cost recovery for a substantial percentage of all inmate calls. The FCC's assertion that ICS providers with costs above the caps operate inefficiently is contrary to the record. The FCC relied on two outlier ICS providers that — combined — represent 0.1 percent of the ICS market. And it ignored evidence showing that the cost to provide ICS varies widely on the basis of regional differences, such as the age and condition of a given facility or the specific security features that correctional authorities demand.

\* \* \* \*

The record includes two economic analyses, both concluding that the *Order*'s rate caps are below cost

> for a substantial number of ICS calls even after
> excluding site commissions. . . .
>
> The *Order* does not challenge these studies or their
> conclusions. On the contrary, it acknowledges that
> seven of 14 ICS providers that submitted cost data
> reported per-minute costs of "$0.25 or higher," above
> the highest prepaid rate cap of $0.22 per minute.

Joint Br. for Pet'rs at 16–17, 30–31 (quoting *Order*, 30 FCC
Rcd. at 12669–70, 12795). Petitioners' claims are well taken
and largely undisputed. And, as noted above, the FCC has
abandoned its contention that the agency lawfully considered
industry-wide averages in setting the rate caps, and for good
reasons.

First, to the extent that the *Order* purports to set caps for
intrastate rates, it is infirm for the reasons stated above. Second,
the averaging calculus is patently unreasonable. The FCC
calculated its rate caps "using a weighted average per minute
cost," *Order*, 30 FCC Rcd. at 12790, allowing providers to
"recover average costs at each and every tier," *id.* n.170. This
makes calls with above-average costs in each tier unprofitable,
however, and thus does not fulfill the mandate of § 276 that
"each and every" inter- and intrastate call be fairly
compensated. *See Am. Pub. Commc'ns Council v. FCC*, 215
F.3d 51, 54, 57–58 (D.C. Cir. 2000).

Moreover, the *Order* advances an efficiency argument –
that the larger providers can become profitable under the rate
caps if they operate more efficiently – based on data from the
two smallest firms. *See Order*, 30 FCC Rcd. at 12790–95. Not
only do those firms represent less than one percent of the
industry, but the record shows that regional variation, not
efficiency, accounts for cost discrepancies among providers.

*See id.* at 12965 n.61 (dissenting statement of Commissioner Pai). The Order does not account for these conflicting record data.

In sum, the *Order*'s analysis of the record data in setting rate caps was not the product of reasoned decisionmaking. We will therefore vacate that portion of the *Order* and remand for further proceedings.

**F.   The Imposition of Ancillary Fee Caps**

Contrary to Petitioners' contentions, the *Order*'s imposition of ancillary fee caps in connection with *interstate* calls is justified. The Commission has plenary authority to regulate interstate rates under § 201(b), including "practices . . . for and in connection with" interstate calls. The *Order* explains that ICS providers use ancillary fees as a loophole in avoiding per-minute rate caps. *Order*, 30 FCC Rcd. at 12842. Furthermore, ancillary fees for *interstate* calls satisfy the test of the Commission's authority under § 201(b) as they are "in connection with" interstate calls. However, these considerations do not fully answer the question whether the disputed imposition of ancillary fee caps is permissible.

As noted above, we have found that, on the record in this case, the *Order*'s imposition of *intrastate* rate caps fails review under § 276. Therefore, we likewise hold that the FCC had no authority to impose ancillary fee caps with respect to *intrastate* calls. However, we cannot discern from the record whether ancillary fees can be segregated between interstate and intrastate calls. We are therefore obliged to remand the matter to the FCC for further consideration.

**G. The Imposition of Reporting Requirements**

The Commission initially contended that the *Order*'s requirements with respect to reporting requirements for video visitation services and site commissions were unripe for review because they were pending budgetary approval by the Office of Management and Budget ("OMB"). After briefing, however, OMB approval was published. *See* 82 Fed. Reg. 12182-01 (Mar. 1, 2017). Accordingly, the Commission withdrew its ripeness challenge. Letter, *Global Tel\*Link* (D.C. Cir. Mar. 1, 2017), ECF No. 1663705. Therefore, the parties agree that we may review the Commission's imposition of the disputed reporting requirements.

We hold that the video visitation services reporting requirement, 47 C.F.R. § 64.6060(a)(4), is too attenuated to the Commission's statutory authority to justify this requirement. The Commission asserts that whether or not video visitation services are a form of ICS, they are still subject to the agency's jurisdiction. *See, e.g.*, *Order*, 30 FCC Rcd. at 12891–92; Br. for FCC at 56–57. We disagree. Before it may assert its jurisdiction to impose such a reporting requirement, the Commission must first explain how its statutory authority extends to video visitation services as a "communication[] by wire or radio" under § 201(b) for interstate calls or as an "inmate telephone service" under § 276(d) for interstate or intrastate calls. The *Order* under review offers no such explanations. We therefore vacate the reporting requirement for video visitation services.

In contrast, we find no merit in Petitioners' challenge to the site commission payment reporting requirement under 47 C.F.R. § 64.6060(a)(3). The quibble between the parties is largely over semantics. The Commission agrees that the definition of site commission payment should be read largely as Petitioners argue: namely, site commissions are "incentive

payments designed to influence a correctional authority's selection of its monopoly service provider, not a form of ordinary tax." Br. for FCC at 59 (citing *Order*, 30 FCC Rcd. at 12818–22). So defined, the reporting requirement is lawful on its face and Petitioners do not disagree. We therefore deny the petition for review.

## H.   The Preemption and Due Process Claims

Petitioner Pay Tel separately challenges the Commission's refusal to preempt certain state ICS rate caps that are lower than those the Commission set in the *Order*. Because we are vacating the portion of the *Order* imposing intrastate rate caps under § 276(b), the preemption provision under § 276(c) is no longer at issue. There are no relevant regulations under § 276 remaining in the *Order* with respect to which the lower state rate caps might be preempted. This issue is therefore moot.

Pay Tel's claim that its due process rights were infringed when it was not given timely access to key cost data that the FCC relied on in setting the rate caps is also moot. We are vacating the portion of the *Order* setting rate caps for intrastate rates;   the Commission has acknowledged that its use of industry-average data to set rates was error; and Pay Tel obtained access to the disputed data prior to the Commission's issuance of the  *Reconsideration Order* setting rate caps that supersede those in the *Order* at issue. The concerns raised by Pay Tel are thus moot.

## III. CONCLUSION

In accordance with the foregoing opinion, we grant in part and deny in part the petitions for review, vacate certain provisions in the disputed *Order*, and remand for further

proceedings with respect to certain matters. We also dismiss two claims as moot.

*So ordered.*

**CLARIFICATION AND AMENDMENT
OF THE MAJORITY OPINION**

After the opinions in this case were issued, the Wright Petitioners filed a petition for rehearing en banc, challenging the panel majority's decision on three points relating to the FCC's *Order* on interstate and intrastate prison phone rates. On the three points in issue, the majority opinion reaches the following judgments:

- We hold that the *Order*'s proposed caps on *intrastate* rates exceed the FCC's statutory authority under the 1996 Act. We therefore vacate this provision.

- We further hold that the use of industry-averaged cost data as proposed in the *Order* is arbitrary and capricious because it lacks justification in the record and is not supported by reasoned decisionmaking. We therefore vacate this provision.

- We find that the *Order*'s proposed wholesale exclusion of site commission payments from the FCC's cost calculus is devoid of reasoned decisionmaking and thus arbitrary and capricious. This provision cannot stand as presently proposed in the *Order* under review; we therefore vacate this provision and remand for further proceedings on the matter.

*Global Tel\*Link v. FCC*, 859 F.3d 39, 45 (D.C. Cir. 2017).

In its petition for rehearing en banc, the Wright Petitioners complain that, "[a]lthough this case involves an ambiguous statute administered by the FCC, the panel did precisely what

*Chevron* disclaimed: it 'impose[d] its own construction on the statute' rather than defer to the FCC's detailed analysis of an ambiguous statute. . . . The panel opinion creates a dangerous loophole to evade judicial review when agencies are unable or unwilling to justify changed positions." Br. for Wright Petitioners at 6, 8 (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984)). These claims are meritless.

Lest there be any confusion over the majority's opinion going forward, there are two points that warrant clarification. First, the majority opinion carefully analyzes the terms of the FCC's *Order* and the agency's justifications in support of the *Order*. The majority does not second-guess the agency. Rather, the majority found the FCC's justifications for the proposed caps on intrastate rates "manifestly contrary to the statute," *Chevron*, 467 U.S. at 844, and clearly unworthy of deference.

Second, as noted above, after reviewing the entire record in this case, the majority opinion concludes that "the *Order*'s proposed caps on *intrastate* rates exceed the FCC's statutory authority under the 1996 Act." It goes without saying that if an agency action exceeds its statutory authority, the agency is entitled to no deference under *Chevron*. *See, e.g.*, *Sullivan v. Zebley*, 493 U.S. 521, 541 (1990); *Goldstein v. SEC*, 451 F.3d 873, 880–81 (D.C. Cir. 2006). As the concurring opinion notes, "the statute's structure and context demonstrates that the agency's interpretation would fail at *Chevron*'s second step; it is an unreasonable (impermissible) interpretation of section 276." If this point was lost in the original opinion issued by the majority, we make it clear now. We need not and do not decide whether we were required to follow *Chevron* Step Two even though the agency declined to defend its position before the court. The important point here is that we have carefully

analyzed the contested provisions of the FCC's *Order* and found that they cannot survive review under either the "best reading" of the statute standard, *Miller v. Clinton*, 687 F.3d 1332, 1342 (D.C. Cir. 2012) (quoting *Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1136 (D.C. Cir. 2001)), or pursuant to *Chevron* Step Two.

There is no *Chevron* question with respect to the majority's decision on the use of industry-averaged cost data as proposed in the *Order*. The majority found that provision arbitrary and capricious because it lacks justification in the record and is not supported by reasoned decisionmaking. The same is true with respect to the majority decision on the *Order*'s proposed wholesale exclusion of site commission payments from the FCC's cost calculus. We found that provision devoid of reasoned decisionmaking and thus arbitrary and capricious. It is clear that no *Chevron* deference is due to agency decisions that are unsupported by reasoned decisionmaking.

SILBERMAN, *Senior Circuit Judge, concurring*: I concur with Judge Edwards' opinion in all respects. I especially agree that *Chevron* deference would be inappropriate in these unusual circumstances. I write separately to point out, as to the FCC's claimed jurisdiction to set intrastate rate caps, that I think our result would be the same if the *Chevron* framework was in play, i.e., if the FCC had elected to defend this part of its regulation.

There is no question that the relevant statutory language, "fairly compensated," is ambiguous. 47 U.S.C. 276(b)(1)(A). Even the FCC agrees. But Judge Edwards' careful explanation of the statute's structure and context demonstrates that the agency's interpretation would fail at *Chevron*'s second step; it is an unreasonable (impermissible) interpretation of section 276.

Much of the recent expressed concern about *Chevron* ignores that *Chevron*'s second step can and should be a meaningful limitation on the ability of administrative agencies to exploit statutory ambiguities, assert farfetched interpretations, and usurp undelegated policymaking discretion.[1] This case presents just one example of those kinds of agency tactics. There are others. *Accord Michigan v. EPA*, — U.S. —, 135 S. Ct. 2699, 2713 (2015) (Thomas, J., concurring) ("Although we hold today that [the agency] exceeded even the extremely permissive limits on agency power set by our precedents, we

---

[1] *See, e.g.*, *City of Arlington v. FCC*, — U.S. —, 133 S. Ct. 1863 (2013) (Roberts, C.J., dissenting). Of course, some also question "step two" itself. For example, an essay in the *Virginia Law Review* contended that *"Chevron Has Only One Step."* Matthew C. Stephenson & Adrian Vermeule, 95 Va. L. Rev. 597 (2009). But that position ignores the practical effect on future agency discretion of a court opinion either affirming or reversing an agency interpretation at step one versus step two. *Cf. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005).

should be alarmed that it felt sufficiently emboldened by those precedents to make the bid for deference that it did here.")

To be sure, some have lamented that as a practical matter, under *Chevron*, either the case is decided at the first step or the agency prevails once it receives deference under step two. But that is not what the *Chevron* case called for.

*Chevron* itself involved a phrase "stationary source" that was not at all defined and clearly could equally refer to (a) a factory complex, or (b) a specific emitter of pollution. 467 U.S. 837, 860-64 (1984). But it would have been unreasonable to refer to (c) a whole city. Yet too many times agencies have taken advantage of an ambiguity to pursue a (c), (d), or (f) interpretation that accorded with policy objectives. *See, e.g.*, *Verizon v. FCC*, 740 F.3d 623, 660 (D.C. Cir. 2014) (Silberman, J., concurring in part and dissenting in part).

Unfortunately, the Supreme Court for some time after *Chevron* contributed to the step one winner-take-all narrative by neglecting to rely on step two even when it was really called for. Take for example *MCI Telecommunications Corp. v. AT&T Co.*, 512 U.S. 218 (1994), in which Justice Scalia—perhaps the foremost expositor of *Chevron*—used statutory structure and context, much like Judge Edwards does in our case, to demonstrate that the FCC's reliance on the word "modify" was unacceptable, *see, e.g.*, *id.* at 228-29. But he never conceded that the word "modify" was ambiguous, which it was. *Id.* at 228 ("We have not the slightest doubt that [single definition] is the meaning the statute intended.").

Subsequently, however, in *AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366 (1999), Justice Scalia implicitly relied on step two. He concluded that because the agency failed to interpret the terms of the statute "in a reasonable fashion," the

rule must be vacated. *Id*. at 392. Then, in *City of Arlington v. FCC*, — U.S. —, 133 S. Ct. 1863 (2013), he admonished that "where Congress has established an ambiguous line, the agency can go no further than the ambiguity will fairly allow," *id.* at 1874. And most recently in *Michigan v. EPA*, — U.S. —, 135 S. Ct. 2699 (2015), when invalidating agency action under step two, he was more explicit still: "*Chevron* allows agencies to choose among competing reasonable interpretations of a statute; it does not license interpretive gerrymanders under which an agency keeps parts of statutory context it likes while throwing away parts it does not," *id*. at 2708.

We have at times been careful to apply step two review vigorously. *See, e.g.*, *Goldstein v. SEC*, 451 F.3d 873 (D.C. Cir. 2006). This is just such a case where the agency's original claim for *Chevron* deference—before the agency's control switched—would have been rejected at *Chevron* step two; a muscular use of that analysis is a barrier to inappropriate administrative adventure.

PILLARD, *Circuit Judge*, dissenting as to Sections II.B through II.F and concurring in part:

The administrative record is full of compelling evidence of dysfunction in the inmate-calling marketplace, with harsh consequences for inmates and their families. The rule under review began with a 2000 lawsuit filed by inmates, family members, loved ones, and counsel (referred to in these proceedings as the Wright Petitioners). Finally acting on the Wright Petitioners' concerns, the FCC in 2015 modestly curtailed exorbitant per-minute calling rates and limited providers' ability to extract confusing and unrelated ancillary fees—amounting to as much as 38 percent of total inmate-calling revenue—for such things as setting up an account, funding an account, issuing a refund, and closing an account. *See* 30 FCC Rcd. 12763, 12838-42 (2015). The record shows that these high prices impair the ability of inmates, by definition isolated physically from the outside world, to sustain fragile filaments of connection to families and communities that they might hope to rejoin. The majority's decision scuttles a long-term effort to rein in calling costs that are not meaningfully subject to competition and that profit off of inmates' desperation for connection.

The majority's path to that result is flawed. I cannot agree that a company is "fairly compensated" under 47 U.S.C. § 276(b)(1)(A) when it charges inmates exorbitant prices to use payphones inside prisons and jails, shielded from competition by a contract granting it a facility-wide payphone monopoly. The majority does not question that Congress enacted the Telecommunications Act of 1996 to combat phone monopolies, facilitate competition, and thereby ensure better service at lower prices to consumers. Consistent with the 1996 Act's general approach of "replac[ing] a state-regulated monopoly system with a federally facilitated, competitive market," section 276 of the Act specifically addressed defects in the intrastate and interstate payphone market (now largely obsolete except in cellphone-free environments such as

prisons). *New England Pub. Commc'ns Council, Inc. v. FCC*, 334 F.3d 69, 77 (D.C. Cir. 2003).

The majority holds it beyond debate that "fairly compensated" is not about fairness to the consumer. It sees no statutory support for the FCC's effort to require fairer intrastate rates for inmates because it reads section 276's fair-compensation mandate as unambiguously one-sided, only empowering the FCC to enhance unfairly low, not to reduce unfairly high, compensation for calls. It accepts Global Tel*Link's characterization of section 276 as nothing but a "no free calls" provision, Oral Arg. Tr. 40:55, confined to the enacting Congress's acknowledged concern about independent payphone providers going uncompensated for certain calls. But that reading is truncated. As it typically does, Congress responded to a particular problem by enacting a law that speaks in more general terms: here, by requiring that payphone calls in prisons and elsewhere be "fairly compensated." It did so for the stated purpose—fully relevant here—of promoting competition among payphone providers to expand the availability of payphone services to consumers. 47 U.S.C. § 276(b)(1).

The majority offers one plausible reading of section 276, but it is assuredly not the only one. Congress has not "directly spoken to the precise question at issue" in this case, so the question for us is whether the FCC's view when it promulgated the challenged rule—that section 276 grants authority not only to raise inadequate rates but also to reduce excessive, monopoly-driven rates—was a "permissible construction of the statute." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). I think it was. If the FCC under new management wishes by notice and comment to change its rule, the statute gives it latitude to do so. We should uphold the rule that is on the books and leave to the agency to decide whether and how to change it.

**I.**

The FCC reasonably interpreted section 276 to "authorize the Commission to impose intrastate rate caps as prescribed in the *Order*." Op. at 20-21. Congress instructed the FCC to "establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone[s]." 47 U.S.C. § 276(b)(1)(A). To begin with, nobody contests that authority to establish "a per call compensation plan" includes some authority over end-user calling rates. Indeed, this court already so held. *See Illinois Public Telecommunications Ass'n v. FCC*, 117 F.3d 555, 562 (D.C. Cir. 1997) ("Because … there is no indication that the Congress intended to exclude local coin rates from the term 'compensation' in § 276, we hold that the statute unambiguously grants the Commission authority to regulate the rates for local coin calls."). And the plain text of the statute grants that authority over both intrastate and interstate payphone services, including "inmate telephone service in correctional institutions." 47 U.S.C. § 276(d). Thus, the only dispute is whether the word "fairly" implies an ability to reduce excesses, as well as bolster deficiencies, in the compensation that payphone providers would otherwise receive.

Importantly, Congress chose "fairly" rather than, say, "adequately," "sufficiently," or "amply." Those words have different meanings. Had it used any of the latter three terms, I would agree that Congress only authorized regulation to prevent under-compensation, but its choice of the word "fairly" denotes no such limitation. *Compare* WEBSTER'S NEW COLLEGIATE DICTIONARY 407 (1980) (defining "fair" as, *inter alia*, "marked by impartiality and honesty: free from self-interest, prejudice, or favoritism"), *with id.* at 14 (defining "adequate" as, *inter alia*, "sufficient for a specific requirement"), *and id.* at 1156 (defining "sufficient" as, *inter*

*alia*, "enough to meet the needs of a situation or a proposed end"). Those words are also used differently in everyday language. *See Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 407 (2011) (court looks to "ordinary meaning" in absence of statutory definition). If a grocer demanded $20 for a banana, we might call that price adequate, sufficient, or ample—but nobody would call it fair.

The statutory context shows that Congress' choice of the word "fairly" reasonably connotes its concern for unfairly excessive as well as deficient compensation. Elsewhere in the Communications Act, Congress used the term "fair" in conjunction with "just" and "reasonable"—familiar terms of art used in connection with rate-setting authority. *See* 47 U.S.C. § 204(b) (providing for partial authorization of new charges, which would otherwise be stayed, if the FCC determines "that such partial authorization is just, fair, and reasonable"); *id.* § 205(a) (authorizing the FCC to prescribe "what classification, regulation, or practice is or will be just, fair, and reasonable"). And the fact that section 276 is one of several "Special Provisions Concerning Bell Operating Companies," *see* Op. at 9, does not suggest that Congress exclusively intended to regulate the relationship between BOCs and non-BOCs to boost the latter's compensation and was wholly unconcerned about the risk that callers would be charged excessive rates.

The purpose and history behind the congressional action here comport with this reading of the statutory text and context. In passing the 1996 Telecommunications Act, Congress aimed to "promot[e] competition in the payphone service industry." *New England*, 334 F.3d at 71; *see also* 47 U.S.C. § 276(b)(1) (stating congressional purpose "to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public"). To be sure, the immediate anti-competitive

malfunction confronting Congress at the time was that certain payphone providers were, under certain circumstances, under-compensated. *See Illinois Pub. Telecomms. Ass'n v. FCC*, 752 F.3d 1018, 1026 (D.C. Cir. 2014). But the central aim was to advance competition to the benefit of the end users of payphone services. Senator Kerry, for instance, explained that his goal in introducing section 276 was "to establish a level playing field for independent payphone providers," and thereby to enable competition "on the basis of price, quality and service, rather than on marketshare and subsidies." 3 Reams & Manz, *Federal Telecommunications Law: A Legislative History of the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996)*, at S710.

Consistent with that pro-competitive agenda, the FCC and this court have long assumed that section 276 provides tools for addressing monopoly power and market failure in the payphone market. For instance, in *Illinois*, the state petitioners argued that the FCC had unlawfully ignored the problem of "locational monopolies," that is, situations in which a payphone provider "obtains an exclusive contract for the provision of all payphones at an isolated location, such as an airport, stadium, or mall, and is thereby able to charge an inflated rate for local calls made from that location." 117 F.3d at 562. We recognized that the FCC had not ignored the problem of locational monopolies; it had simply "concluded that it would deal with them if and when specific [providers] are shown to have substantial market power." *Id.* Now, twenty years later, the FCC has identified a discrete area where payphone providers do have substantial market power: prisons and jails. The inmate-calling market is, the FCC found, "a prime example of market failure" because, instead of competing to reduce rates and improve services for callers, providers compete to offer ever-higher site commissions to correctional facilities so as to gain monopoly access to a literally captive consumer base. 30 FCC Rcd. at 12765 & n.9.

Nevertheless, the majority cites four considerations that influenced its rejection of the FCC's claimed authority over intrastate inmate calling services. Op. at 21-24. None is compelling.

First, the majority notes that section 152(b) "erects a presumption against the Commission's assertion of regulatory authority over *intrastate* communications." Op. at 21 (citing *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 373 (1986)). That is true, but section 276, by its plain terms, "overcom[es] this presumption." Op. at 21. Congress instructed the FCC to ensure fair compensation for *all* payphone calls—interstate and intrastate. 47 U.S.C. § 276(b)(1)(A). To that end, Congress expressly provided for preemption of inconsistent state regulation. *Id.* § 276(c). This case is thus unlike *Louisiana*, which held that federal power over depreciation charges pursuant to section 220 was limited to the interstate ratemaking context; it is simply not "possible" here that section 276 "do[es] no more than spell out the authority of the FCC . . . in the context of interstate regulation." *Louisiana*, 476 U.S. at 377. Whatever section 276 means, it applies in both the interstate and intrastate contexts. *Cf. N.Y. & Pub. Serv. Comm'n of N.Y. v. FCC*, 267 F.3d 91, 102-03 (2d Cir. 2001) (concluding that section 251(e) clearly "grants the FCC authority to act with respect to those areas of intrastate service encompassed by the terms 'North American Numbering Plan' and 'numbering administration,'" and applying *Chevron* deference to agency's interpretation of "what either term encompasses").

Second, the majority says that "the *Order* erroneously treats the Commission's authority under § 201 and § 276 as coterminous." Op. at 21. My colleagues appear to draw that conclusion from the FCC's repeated use of the phrase "just, reasonable, and fair"—an amalgam of the two provisions' key terms. As I read the Order, the bundling of those three words

simply reflects that the FCC's authority over inmate calling derives from the sum of those authorizations. The majority's inference that the Order fails to respect the difference between sections 201 and 276, and in particular, fails to appreciate that section 201 applies only to interstate rates, has no support in the record.

Third, the majority concludes that the FCC erred in finding support for its approach in prior agency orders. Op. at 22-23. The majority says that "the prior orders . . . focused on payphone providers and carriers to determine whether the providers were fairly compensated." Op. at 23. But this court has held that "compensation" includes end-user rates; it is not limited to payments between payphone providers and carriers. *Illinois*, 117 F.3d at 562 ("[W]e hold that the statute unambiguously grants the Commission authority to regulate the rates for local coin calls.").

Fourth, the majority says the FCC mistakenly relied on this court's decisions in *Illinois* and *New England*. Op. at 24-26. The majority acknowledges that *Illinois* "held that § 276 unambiguously overrode § 152(b)'s presumption against intrastate jurisdiction insofar as it granted the Commission authority to 'set' reimbursement rates for local coin calls in order to ensure that payphone operators who were previously uncompensated were 'fairly compensated.'" Op. at 24. According to the majority, however, setting rates to increase providers' compensation is different from reducing "already compensatory rates." Op. at 25. Yet *Illinois* ratified the FCC's assertion of authority to regulate "locational monopolies." 117 F.3d at 562. The majority responds that the FCC never said it would consider intrastate rate caps as the means of breaking up such monopolies. *See* Op. at 25. But the FCC, as we noted in *Illinois*, "specifically reserved the right to modify its deregulation scheme, for example, by limiting the number of compensable calls from each payphone." 117 F.3d at 563.

Limiting the number of compensable calls per phone is, of course, economically similar to limiting the rate per call; either incentivizes broader deployment of payphones to maintain the same revenue levels. Thus, the FCC contemplated, and the Court approved, just the sort of pro-consumer regulation the FCC eventually undertook in the Order under review.

Petitioners argue that in the rule at issue in *Illinois*, the FCC had merely claimed the authority "to adjust the per-call compensation scheme that the FCC itself put in place to ensure fair compensation," not the "authority to regulate existing market rates." ICS Pet'rs Br. 46 n.31. That is a false dichotomy. *Cf. Illinois*, 117 F.3d at 563 ("A market-based approach is as much a compensation scheme as a rate-setting approach."). The bottom line is that the FCC anticipated the problem of monopoly power in the provision of payphone services, and this Court ratified the agency's authority to combat that problem by reducing providers' compensation, including by adjusting end-user rates. There is thus no basis for the majority's contention that "the FCC consistently construed its authority over intrastate payphone rates as limited to addressing the problem of under-compensation for ICS providers." Op. at 5.

The majority also takes issue with the Order's invocation of *New England*, but the FCC correctly relied on that precedent for the limited point that "section 276 unambiguously and straightforwardly authorizes the Commission to regulate [the Bell Operating Companies'] intrastate payphone line rates." 30 FCC Rcd. at 12815 (quoting 334 F.3d at 75). The fact that the FCC and this court previously articulated section 276 authority in terms of generic rate regulation is relevant here. And, contrary to the majority, *New England*'s holding that section 276(b)(1)(C) does not apply to non-Bell Operating Companies has no resonance in this case. The provision at issue here, section 276(b)(1)(A), is indisputably applicable to non-BOCs:

it requires that "*all* payphone service providers [be] fairly compensated." 47 U.S.C. § 276(b)(1)(A) (emphasis added).

None of this is to suggest that the FCC has the same "broad plenary authority to regulate and cap intrastate rates" that it has over interstate rates. Op. at 26. Notably, whereas section 201 broadly requires that "[a]ll charges, practices, classifications, and regulations for and in connection with [interstate] communication service[] shall be just and reasonable," section 276 is more narrowly focused on "compensation." The FCC simply did not need "broad plenary authority" to conclude that inmate calling service providers charging as much as $56.00 for a four-minute call, *see* Op. at 11, were not being "fairly compensated."

## II.

The majority also holds that the FCC's complete exclusion of site commissions from its cost calculus and its use of industry-wide averages were arbitrary and capricious. *See* Op. at 28-33. It is unclear why the majority finds it necessary to address how the caps were calculated, given its rejection of the FCC's power to cap at all. In any event, the majority's analysis is misguided.

Regarding site commissions, the majority says that "[i]gnoring costs that the Commission acknowledges to be legitimate is implausible." Op. at 29. But the FCC did not acknowledge site commissions as legitimate costs. Quite to the contrary, the FCC agreed with a commenter who described site commissions as "legal bribes to induce correctional agencies to provide ICS providers with lucrative monopoly contracts." 30 FCC Rcd. at 12821. In other words, the FCC viewed site commissions not as real costs of doing business, but as "an apportionment of profit" between providers and correctional facilities. *Id.* at 12822. The majority suggests that if site commissions are "directly related to the provision" of inmate

calling services in that they are conditions of receiving contracts to provide such services, they are "therefore legitimate." Op. at 30. That equation makes no sense; the fact that a cost was charged under a prior regulatory regime cannot mean the agency is required to recognize that cost as "legitimate" and is disempowered from regulating it.

Simply put, the fact that a state may demand them does not make site commissions a legitimate cost of providing calling services. The majority asserts that "[i]n some instances, commissions are mandated by state statute," Op. at 29, but the record reflects that there is only one such statute, Tex. Gov't Code Ann. § 495.027(a)(2). That statute categorically demands site commissions of at least 40 per cent of the provider's gross revenue, which only illustrates the problem that site commissions are a form of monopoly rent not tied to actual costs.

Indeed, considering site commissions as a compensable cost would effectively negate the FCC's authority to mitigate locational monopolies. Imagine that a payphone provider (in the pre-cell phone era) contracted with a large stadium to provide just three payphones, anticipating that its monopoly would enable it to charge several dollars per minute while kicking back some percentage to the stadium. Plainly, the statutory goals of "competition" and "widespread deployment of payphone services" could be well served by a rule imposing reasonable, market-sensitive price caps to spur providers to offer more phones to maintain the same levels of revenue. 47 U.S.C. § 276(b)(1). But any such price cap would be worthless if it had to be calculated to ensure that the provider could continue its kickbacks to the stadium. The kickback arrangement might, in some sense, be "related" to the provision of payphone services at the stadium, but it is not "reasonably" related because acceding to such preexisting contractual relationships is inconsistent with the statutory scheme.

On the averaging issue, the majority concludes that because the Order "makes calls with above-average costs . . . unprofitable," it "does not fulfill the mandate of § 276 that 'each and every' inter- and intrastate call be fairly compensated." Op. at 32. This holding seems to follow from the majority's pinched interpretation of section 276 as a one-way ratchet whereby providers are always entitled to recoup "actual" costs incurred under monopoly conditions, no matter how extravagant. As I have explained, I believe that section 276 conveys some authority to lower rates, which means the FCC need not take as given "calls with above-average costs."

Additionally, the majority fails to reckon with the FCC's independent authority to cap rates for interstate calls under section 201, despite acknowledging that this power is "broad" and "plenary." Op. at 26. In my view, the FCC has wide discretion under its section 201 "just and reasonable" interstate ratemaking authority to decide which costs to take into account and to use industry-wide averages that do not necessarily compensate "each and every" call, as section 276 requires. *See Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 475 F.3d 1277, 1280 (D.C. Cir. 2007) (agency is not "weaponless against conduct that might encourage or cloak the running up of unreasonable costs"). As the state petitioners aptly summarized, section 201 "gave the Commission broad regulatory authority over interstate communication in a 'traditional form,' mirroring regulation of railroads and public utilities, enabling it to set rates to allow a monopolistic utility to recover a reasonable profit but also protect the consumer from unjustly high prices." State Pet'rs Br. at 28-29. The majority never explains why the FCC's rate-setting methodology would be impermissible as to the interstate caps.

## III.

Finally, I note that the majority offers no persuasive reason for abandoning the *Chevron* framework (which it admittedly

does only in *dicta*, as *Chevron* deference plays no role in an opinion holding section 276 unambiguous). It acknowledges that the Order is "presumptively subject" to deferential review, but then concludes that "it would make no sense for this court to determine whether the disputed agency positions advanced in the *Order* warrant *Chevron* deference when the agency has abandoned those positions." Op. at 18. Absent any briefing on the subject or any citation to precedent, I cannot agree.

The FCC, through notice-and-comment rulemaking, took certain positions—most notably that section 276 authorizes regulation of the fairness of intrastate inmate-calling rates— and defended them vigorously in briefing before this court. Less than a month before argument, the court on its own motion directed the parties to explain whether this case should be held in abeyance in light of recent personnel changes at the FCC. The FCC responded that the court should "move forward on the current schedule." Doc. No. 1656116 (Jan. 17, 2017). Two weeks later, and just a week before argument, the FCC informed us that it would no longer defend certain points that it had briefed, but that the Wright Petitioners would "defend all aspects of the Order." Doc. No. 1658521 (Jan. 31, 2017). The FCC has not committed to formally reviewing the Order, as other similarly situated agencies have recently done. *See, e.g.*, *Murray Energy Corp. v. EPA*, No. 15-1385, Doc. No. 1670218 (April 7, 2017) (requesting postponement of oral argument so that agency could "fully review" the relevant rule). By suggesting that agencies can relinquish judicial deference through such limited and belated maneuvers as refusing to defend portions of their briefs during oral argument, the majority risks enabling agencies to end-run the principle that they must "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015).

* * *

The majority appears to leave an opening for the FCC—on some other record and by some other reasoning—to rein in excessive inmate-calling rates, both interstate and intrastate. *See* Op. at 20, 29, 32 (limiting its analysis to the record in this case). And the majority invites the FCC to determine whether some "portions of site commissions" are illegitimate and non-compensable. Op. at 30. Still, because the majority shortchanges the FCC's authority to reduce excessive, monopoly-driven rates, finds "implausible" the agency's reasoned approach to a grave problem, and unnecessarily suggests limitations on *Chevron* deference, I respectfully dissent from Sections II.B through II.F of the majority opinion.