# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 20, 2017　　　Decided August 17, 2018

No. 17-7059

AMERICAN FREEDOM DEFENSE INITIATIVE, ET AL.,
APPELLANTS

v.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,
WMATA AND PAUL J. WIEDEFELD, IN HIS OFFICIAL CAPACITY
AS GENERAL MANAGER FOR WMATA,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01038)

———

*Robert J. Muise* argued the cause for appellants. With him
on the briefs was *David Yerushalmi*.

*Donald B. Verrilli, Jr.* argued the cause for appellees.
With him on the briefs were *Chad I. Golder*, *Jonathan S.
Meltzer*, *Patricia Y. Lee*, *Gerard J. Stief*, and *Rex S. Heinke*.

Before: HENDERSON and SRINIVASAN, *Circuit Judges*, and
GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge*
GINSBURG.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

GINSBURG, *Senior Circuit Judge*:  The American Freedom Defense Initiative (AFDI), Pamela Geller, and Robert Spencer,[1] sought to run advertisements in Metrorail stations and on Metrobuses in the Washington, D.C. area.  The Washington Metropolitan Area Transit Authority (WMATA) refused the advertisements because they violated a then-recently adopted moratorium on issue-oriented advertising in the Metro system.  AFDI sued both WMATA and its then-general manager, Jack Requa,[2] claiming WMATA's refusal to display its advertisements violated its rights to free speech and equal protection under the First and Fourteenth Amendments to the Constitution of the United States.  The district court granted summary judgment on behalf of WMATA, which we affirm in part and reverse in part.

## I.  Background

WMATA, which was created by an interstate compact among the District of Columbia, Maryland, and Virginia, operates the Metrorail and Metrobus services that provide Washington-area residents with the majority of their public transit options.  D.C. CODE § 9-1107.01.  Relevant to this litigation, WMATA permits advertising throughout the Metro system; specifically, Metrobuses display advertisements on their exteriors, and the Metrorail stations contain advertising "dioramas."

---

[1] For the sake of brevity, we refer to the plaintiffs collectively as AFDI.

[2] Requa is no longer WMATA's general manager; Paul Wiedefeld, the new general manager, has taken his place as a defendant.

AFDI describes itself as "a nonprofit organization ... dedicated to freedom of speech, freedom of conscience, freedom of religion, and individual rights." It "promotes its objectives by ... purchasing advertising space on transit authority property ... to express its message on current events and public issues, including issues involving the suppression of free speech by Sharia-adherent Islamists and complicit government officials." It was in furtherance of this mission that AFDI wanted to advertise in the Metro system in May 2015.

AFDI submitted two advertisements, identical in content, one to be displayed on the exteriors of Metrobuses and the other meant for Metrorail station dioramas. The advertisements depict a turbaned, bearded, sword-wielding man who is apparently meant to be the Prophet Muhammad. A speech bubble emerging from the man's mouth contains the sentence "YOU CAN'T DRAW ME!" Below the man is a disembodied hand, paler in color, holding either a pen or a pencil pressed to paper. From the hand comes a speech bubble reading "THAT'S WHY I DRAW YOU." The phrase "SUPPORT FREE SPEECH" appears at the top of the advertisements. According to AFDI's complaint, the advertisements "make the point that the First Amendment will not yield to Sharia-adherent Islamists who want to enforce so-called blasphemy laws here in the United States, whether through threats of violence or through the actions of complicit government officials."

When WMATA began accepting advertising in the 1970s, it accepted issue-oriented advertisements, including political, religious, and other advocacy. According to the uncontested testimony of Lynn Bowersox, WMATA's Assistant General Manager for Customer Service, Communications, and Marketing, WMATA had dealt with controversies surrounding

issue-oriented advertisements for much of the 1980s and 1990s. In the early 2010s, however, the controversies grew, with monthly complaints over advertisements that disrespected President Obama, depicted animal cruelty, advocated the use of condoms to prevent sexually-transmitted diseases, and supported the legalization of marijuana. By the time AFDI submitted the advertisements at issue in this case, WMATA's leadership had spent "nearly 5 years of looking at" the question whether to permit issue-oriented advertisements.

AFDI submitted its advertisements in May 2015. Not long thereafter, Ms. Bowersox directed her staff to prepare a memorandum detailing WMATA's history with AFDI. Additionally, Mr. Mort Downey, then Chairman of WMATA's Board, sent Ms. Bowersox an email message to which he attached an article about a recent shooting in Garland, Texas linked to the advertisements AFDI wanted to run on the Metro system; he asked Ms. Bowersox to be prepared to discuss it at the May meeting of the Board. Ms. Bowersox also prepared for the executive session of the board meeting a memorandum advocating the closure of WMATA's advertising space to issue-oriented advertising. In her deposition, Ms. Bowersox allowed as how AFDI's submission was "the straw that broke the camel's back" and prompted her to recommend WMATA temporarily refuse to run issue-oriented advertisements.

The consensus among members of the Board at the executive session was to accept Ms. Bowersox's recommendation of a temporary moratorium on issue-oriented advertisements, which by its terms "close[d] WMATA's advertising space to any and all issue-oriented advertising, including but not limited to, political, religious and advocacy advertising until the end of the calendar year." No member of the Board mentioned AFDI's advertisements; the only specific advertisements mentioned were either "talking about open

skies agreements with certain Mid-East countries" or detailing "animal experimentation practices at some of our national science institutes." With the Moratorium in place, WMATA rejected AFDI's proposed advertisements.

In July 2015, AFDI sued, claiming WMATA's "restriction on [AFDI's] speech [was] content- and viewpoint-based in violation of the Free Speech Clause of the First Amendment" and WMATA's "true purpose for adopting the [Moratorium] was to silence the viewpoint expressed by [AFDI's] speech." For the same reasons AFDI claimed WMATA's actions deprived it of equal protection under the law, in violation of the Fourteenth Amendment.

WMATA did not sit idly by during the pendency of this litigation. In November 2015, it rescinded the Moratorium and adopted a series of "Guidelines Governing Commercial Advertising," the relevant parts of which provide:

> 9. Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited.

> 11. Advertisements that support or oppose any political party or candidate are prohibited.

> 12. Advertisements that promote or oppose any religion, religious practice or belief are prohibited.

> 13. Advertisements that support or oppose an industry position or industry goal without direct commercial benefit to the advertiser are prohibited.

AFDI did not amend its complaint to take account of the new Guidelines; its complaint still challenges only the Moratorium,

which is no longer in place. Neither did it resubmit to WMATA the previously rejected advertisements for reconsideration under the Guidelines.

The district court granted WMATA's motion for summary judgment. *AFDI v. WMATA*, 245 F. Supp. 3d 205 (D.D.C. 2017). First, the court determined WMATA's advertising space was a nonpublic forum once the Moratorium came into effect. *Id.* at 210-11. Speech-restrictive actions in a nonpublic forum must be both viewpoint neutral and reasonable, *see Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001), and the district court concluded WMATA's restrictions were both. *See WMATA*, 245 F. Supp. 3d at 211-13. The district court also held neither the Moratorium nor the Guidelines were unconstitutionally vague. *Id.* at 213-14.

## II. Analysis

Because AFDI did not amend its complaint, we face at the outset a jurisdictional question: Did the repeal of the Moratorium moot this case? We conclude it did not. Though the district court did not address mootness, "we have an independent obligation to assure ourselves of jurisdiction." *Am. Council of Life Insurers v. D.C. Health Benefit Exch. Auth.*, 815 F.3d 17, 19 (D.C. Cir. 2016) (internal quotation marks omitted).

### A. Justiciability

We are acutely aware that "Article III of the Constitution restricts the federal courts to deciding only actual, ongoing controversies, and a federal court has no power to render advisory opinions or decide questions that cannot affect the rights of litigants in the case before them." *Nat'l Black Police Ass'n v. Dist. of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997)

(cleaned up). Though a plaintiff's claim may be justiciable when filed, "a federal court must refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Initiative & Referendum Inst.* (*IRI*) *v. USPS*, 685 F.3d 1066, 1074 (D.C. Cir. 2012) (internal quotation marks omitted). At first blush, that is what seems to have happened here. AFDI's complaint seeks injunctive and declaratory relief only against the Moratorium, but the Moratorium was replaced by the Guidelines in November 2015. There seems little point in enjoining the enforcement of a moratorium that is no longer in place.

Here, however, "[t]he intervening event ... is of the [defendant]'s own doing." *IRI*, 685 F.3d at 1074. When this occurs, we examine whether the defendant's voluntary cessation of the challenged action truly renders the case moot. *Id.* Generally it does not unless "(1) there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely or irrevocably eradicated the effects of the alleged violation." *Nat'l Black Police Ass'n*, 108 F.3d at 349 (cleaned up).

This, however, is not a mine-run case of voluntary cessation. WMATA did repeal the challenged Moratorium, but it replaced the Moratorium with a policy that is fundamentally similar; the Guidelines are in effect a particularization and finalization of the temporary Moratorium. It is not quite correct to say WMATA has ceased the challenged conduct; instead, WMATA has renewed the challenged conduct in a new form.

An analogous Supreme Court decision makes clear this case is not moot. *Northeastern Florida Chapter of Associated*

*General Contractors of America* (*AGC*) *v. City of Jacksonville*, involved a challenge to a minority-owned business preference in the Jacksonville purchasing code. 508 U.S. 656, 658 (1993). Shortly after the Court had granted certiorari, Jacksonville repealed that portion of its purchasing code and replaced it with a new ordinance differing only in minor respects. *Id.* at 660-61. The Court held the case was not moot: "There [was] no mere risk that Jacksonville [would] repeat its allegedly wrongful conduct" for "it [had] already done so." *Id.* at 662. The voluntary cessation exception to mootness is not limited, however, to cases in which "the *selfsame* statute will be [re]enacted"; "if that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect." *Id.* The new ordinance in *AGC* "may [have] disadvantage[d] [the plaintiffs] to a lesser degree than the old one, but ... it disadvantage[d] them in the same fundamental way." *Id.* Therefore the case was not moot. *See also Global Tel\*Link v. FCC*, 866 F.3d 397, 413-14 (D.C. Cir. 2017).

So too here. WMATA does not contend the change to the Guidelines has remedied AFDI's alleged injury; clearly AFDI's proposed advertisements are just as unacceptable to WMATA under the Guidelines as they were under the Moratorium; the Moratorium banned issue-oriented advertisements, and so do the Guidelines. AFDI, in other words, is still disadvantaged in the same fundamental way. Indeed, AFDI's briefs are best read to say it would resubmit its advertisements but for their certain rejection under the Guidelines.[3]

---

[3] Our dissenting colleague believes the case is moot because the Guidelines "do not differ[] only in some insignificant respect" from the Moratorium, Diss. Op. at 7 (quoting *AGC*, 508 U.S. at 662); the Guidelines and the Moratorium, in her view, ask "different questions." The Moratorium simply asks whether an advertisement

One further question remains: Should we decide the constitutionality of the Moratorium or the constitutionality of the Guidelines? "A change in the law between a nisi prius and an appellate decision requires the appellate court to apply the changed law." *Ziffrin, Inc. v. United States*, 318 U.S. 73, 78 (1943). Though the present situation is slightly different, for the policy here changed prior to rather than after the district court's decision, precedent and practicality direct us to deal with the world as it is now, not as it was when the case was filed. As for precedent, we note the Supreme Court routinely considers agency regulations that had superseded the originally challenged regulation during the course of the litigation. *See, e.g.*, *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 53 (1974) ("We, of course, must examine the statute and the regulations as they now exist"); *Thorpe v. Housing Auth. of Durham*, 393 U.S. 268, 281-82 (1969) (noting the "general rule" that "an appellate court must apply the law in effect at the time it renders its decision").[4] As for practicality, we see no advantage to either

is "an issue-oriented ... political, religious, [or] advocacy advertisement" while the Guidelines ask whether an advertisement violates Guideline 9, 11, 12, 13, or 14. *Id.* at 6. To this end, she cites several cases for the proposition that substantial changes between an old, repealed law and a new law enacted during the course of litigation can moot a case.

The changes here, however, were not material to the case at hand. Both the Moratorium and the Guidelines sought to ban issue-oriented advertising, in all its forms, from WMATA's advertising space, the only difference being the degree of detail in which they do so. That the Guidelines are more specific does not alter the harm to AFDI; they "disadvantage [it] ... in the same fundamental way" as did the Moratorium. *AGC*, 508 U.S. at 662.

[4] In *Global Tel\*Link* this court evaluated the original FCC order, which had arguably been superseded by the order on reconsideration. *Global Tel\*Link*, 866 F.3d at 414. There, however, the more recent

of the parties in our ruling upon a policy that has no continuing bite.

## B. Merits

Having concluded this case remains justiciable, we move to the merits. We classify WMATA's advertising space as a nonpublic forum and hold WMATA's restrictions are viewpoint-neutral; we remand to the district court the question whether the restrictions are reasonable, which that court should reexamine in light of *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018).

Our review of a district court's grant of summary judgment is *de novo. Bank of N.Y. Mellon Trust Co. NA v. Henderson*, 862 F.3d 29, 32 (D.C. Cir. 2017). Summary judgment should issue "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]here is such a 'genuine issue' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1031 (D.C. Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). There are no disputed facts in this case. The only dispute concerns application of the law to the agreed facts.

AFDI challenges only Guidelines 9, 11, 12, and 13. We note at the outset that Guidelines 11 (banning "[a]dvertisements that support or oppose any political party of candidate") and 13 (prohibiting "[a]dvertisements that support or oppose an industry position or industry goal without any direct commercial benefit to the advertiser") are obviously

---

order was "not before [the court]," *id.*, whereas here the Guidelines have been put before us by AFDI's briefs.

inapplicable to this litigation; AFDI's advertisements are not partisan, and they are not related to any industry. We discuss Guidelines 9 and 12 in further detail below.[5]

### 1. Forum classification

Our analysis of a restriction on speech on government property begins with the forum doctrine. *IRI*, 685 F.3d at 1070. Under *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 45-46 (1983), a governmentally controlled forum that could potentially be used for speech may be a traditional public forum, a designated public forum, or a nonpublic forum. Traditional public forums — sidewalks, parks, and the like — are not implicated here. A designated public forum is "public property which the state has opened for use by the public as a place for expressive activity." *Id.* at 45. A designated public forum need not remain open "indefinitely," but so long as it is open the Government may put in place only reasonable time, place, and manner regulations and narrowly drawn content-based prohibitions. *Id.* at 45-46. Nonpublic forums are, essentially, other Government-owned property where some speech is permitted — for example, an inter-school mail system. *Id.* at 46. It is important here to note that "[t]he government does not create a public forum by ... permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985). In sum, a designated public forum is a nontraditional public space the Government has

---

[5] There is some overlap between Guideline 9, which bans advertisements "intended to influence members of the public regarding an issue on which there are varying opinions," and Guideline 14, which bans advertisements "intended to influence public policy." Because AFDI does not challenge Guideline 14, however, we do not address it here.

opened to speech without restriction; a nonpublic forum is a nontraditional public space the Government has opened to speech with restrictions.  *See id.*

AFDI and WMATA differ as to how WMATA's advertising space fits into the forum doctrine.  We need not resolve this disagreement, however, because another panel of this circuit recently held the space is a nonpublic forum. *Archdiocese of Washington v. WMATA*, No. 17-7171, slip op. at 9-14 (D.C. Cir. July 31, 2018), and we are bound to follow that decision.  *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc).

The status of Metro advertising as a nonpublic forum renders a large part of AFDI's brief irrelevant, including its claim to special protection of its speech based upon *Matal v. Tam*, 137 S. Ct. 1744 (2017) (holding a ban on federal registration of disparaging trademarks violated the First Amendment).  To that end, it quotes the anodyne statement that "[s]peech may not be banned on the ground that it expresses ideas that offend."  *Id.* at 1751.  The relevance of a case in which the Supreme Court did not engage in a forum analysis at all escapes us; *Matal* did not discuss forum doctrine in any depth because *Matal* dealt not with the Government permitting speech on government property but with government protection of speech from commercial infringement.  Apart from the quoted statement cited above, all AFDI's references to *Matal* invoke Justice Kennedy's concurrence, which of course did not speak for the Court.

AFDI also spills much ink on characterizing WMATA's restrictions as a "prior restraint."   Accepting AFDI's characterization *arguendo*, it is of no moment:  A nonpublic forum is by definition a place where the Government may disallow certain types of speech.

Finally, AFDI complains WMATA's restrictions are content-based, as indeed they are. Content-based restrictions, however, are permissible in a nonpublic forum: "[A]ccess to a nonpublic forum can be based upon subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806.

## 2. Viewpoint neutrality and reasonableness

We move, then, to AFDI's arguments concerning viewpoint neutrality and reasonableness. We conclude the Guideline properly before us is viewpoint-neutral, but we remand the case to the district court to reconsider the question of reasonableness.

## A. Viewpoint neutrality

Though its briefs are confused, from what we can discern AFDI offers three separate arguments to support its claim that the Guidelines are not viewpoint-neutral. First, it brings what amounts to an as-applied challenge, contending that, even if the Guidelines are facially neutral, adopting the Moratorium and the Guidelines bespeak an intent to discriminate specifically against the views of AFDI. Second, it contends the ban on issue-oriented advertising is facially viewpoint-discriminatory. Third, it gestures at an argument that Guideline 12, which bans "[a]dvertisements that promote or oppose any religion, religious practice or belief," effectively closes the forum to its antireligious speech, which it argues must be permitted under various Supreme Court cases. We find merit in none of the arguments.

14

### i. As-applied challenge

The parties point to no case in the Supreme Court or in this circuit in which a change in the status of a forum was challenged on the ground that it was intended *sub silentio* to suppress the views of a particular party. Nevertheless, we assume such a claim is viable, as exemplified by *Ridley v. Massachusetts Bay Transportation Authority*, 390 F.3d 65 (1st Cir. 2004), which dealt with a similar claim of seeming viewpoint neutrality masking insidious bias.

At the outset, we note that as a general rule "[t]he government is free to change the nature of any nontraditional forum as it wishes." *Ridley*, 390 F.3d at 77. But the rule is not without an exception: For the Government to change the nature of a forum in order to deny access to a particular speaker or point of view surely would violate the First Amendment. Here, if WMATA adopted the Moratorium and subsequent Guidelines with the intent of suppressing the views of AFDI, then we would hold the Guidelines unconstitutional as applied to AFDI. Therefore, "[t]he [WMATA]'s mere recitation of viewpoint-neutral rationales (or the presentation of a viewpoint-neutral guideline) for its decisions to reject the [advertisements at issue] does not immunize those decisions from scrutiny." *Id.* at 86.

The question is how to identify the Government's intent. Of course, direct evidence of viewpoint discrimination would be highly probative, but "the government rarely flatly admits it is engaging in viewpoint discrimination." *Id.* That leaves two types of evidence. The first is retrospective, that is, evidence from before the decision was taken to close the forum insofar as it may show whether the Government acted in order to suppress a disfavored view. The second is prospective, namely evidence of what happened once the forum was closed. AFDI

focuses its argument upon what happened in the lead up to closing the forum, whilst WMATA focuses its argument upon the lack of evidence of viewpoint discrimination once access to the forum was restricted.

Retrospective evidence begins with "statements by government officials on the reasons for" closing the forum. *Id.* at 87. Assuming those statements provide a legitimate reason, the plaintiff may attempt to show "the viewpoint-neutral ground is not actually served very well by the specific governmental action at issue ... in other words, the fit between means and ends is loose or nonexistent." *Id.*; *see also United States v. Griefen*, 200 F.3d 1256, 1265 (9th Cir. 2000) ("Should it appear ... that the order [closing the forum] was not narrowly tailored to the realities of the situation ... the federal courts are capable of taking prompt and measurably appropriate action"). If, for example, the Government had said it wished to close a forum to political speech but passed regulations banning only anti-abortion messaging, then its action would undermine its claim of viewpoint neutrality.

Other, less probative types of retrospective evidence might also play a role. We are guided here by the test the Supreme Court has used to unearth tacit discrimination on the basis of race. "The historical background of the decision" is relevant; if the Government had repeatedly been found to have engaged in viewpoint discrimination, especially against the plaintiff, then courts should look skeptically at its seemingly viewpoint-neutral rationale. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). "The specific sequence of events leading up to the challenged decision," such as "[d]epartures from the normal procedural sequence" and "[s]ubstantive departures" from "the factors usually considered important" may also be relevant. *Id.*

16

In terms of prospective evidence, most relevant is a lack of evenhandedness in the Government's actions after the forum is closed. "[W]here the government states that it rejects something because of a certain characteristic, but other things possessing the same characteristic are accepted, this sort of underinclusiveness raises a suspicion that the stated neutral ground for action is meant to shield an impermissible motive." *Ridley*, 390 F.3d at 87 (footnote omitted); *see also, e.g.*, *Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cty.*, 653 F.3d 290, 297-98 (3d Cir. 2011) (accepting a "comparator analysis" between the plaintiff's rejected advertisement and several similar accepted advertisements as evidence of viewpoint discrimination). Also relevant is any post-hoc rationalization for the change in the forum; if the Government proffers one reason when closing the forum but another when it later defends the closing, then that in itself is evidence of pretext. *Cf. Coleman v. Ann Arbor Transp. Auth.*, 947 F. Supp. 2d 777, 788 (E.D. Mich. 2013) (noting in dicta that "post-hoc rationalization" could be evidence of viewpoint discrimination).

Applying this framework to AFDI's claims, it is clear they fall short, indeed, so far short that no reasonable jury could uphold them. First, AFDI has provided no prospective evidence whatsoever; it cites no example of an issue-oriented advertisement being run on Metrobuses or in Metrorail stations once the Moratorium was adopted, nor has AFDI pointed to any inconsistency in WMATA's explanation for its decision to close the forum. Neither has AFDI shown any mismatch between WMATA's stated reason for closing — to avoid being involved in further controversies arising from issue-oriented advertisements — and its decision to end the problem by banning all issue-oriented advertisements. In other words, there is a fit between WMATA's means and its stated ends.

Indeed, AFDI's own assumptions speak to the lack of mismatch here. AFDI emphasizes the importance of advertising to WMATA's budget and hints WMATA would not have reduced its advertising revenue unless it was to discriminate against AFDI. That would counsel banning the fewest advertisements consistent with excluding AFDI's. Yet there is no question the Moratorium and the Guidelines sweep out far more than just AFDI's advertisements. If WMATA wished to keep out these particular advertisements, then it could have banned, as one example, advertisements "with a demonstrated link to violence," which would have sufficed given the events in Garland, Texas. That WMATA put in place a much broader ban, even though it resulted in a larger potential loss of revenue, strongly suggests it was not discriminating against the views of AFDI.

The evidence AFDI proffers is weak. It stakes much of its case upon Ms. Bowersox's depicting AFDI's advertisement as "the straw that broke the camel's back" with regard to issue-oriented advertisements in the forum. AFDI seems to misunderstand this metaphor. The point is that no particular straw shoulders all the blame. Each straw, on its own, contributed to breaking the unfortunate camel's back. The last straw was last by pure happenstance, not intent. So too here. That AFDI's advertisements were the last in a long line of controversial or potentially controversial advertisements does not mean the closure of the forum was meant to keep out the views of AFDI in particular.

AFDI also points to the confusion over how to place the Moratorium on the schedule for WMATA's Board meeting, Mr. Downey's request that Ms. Bowersox be prepared to discuss the violence surrounding AFDI's advertisements in Texas, and the haste with which the Moratorium was passed, but these events are consistent with WMATA's stated reason

for restricting the forum. When AFDI submitted its advertisements, WMATA decided that it was no longer willing to tolerate the controversies advertisements like them engendered. It did act with haste to change its policies, but AFDI does not even suggest WMATA violated its own procedural rules. Regarding AFDI's point about Mr. Downey's email, we note that neither the violence in Texas nor AFDI itself was even mentioned at the Board meeting and therefore seems irrelevant to the Board's decision adopting the Moratorium. AFDI is essentially asking us to infer WMATA harbored an illicit intent without proffering any evidence to that effect. No reasonable jury could do that.

The contrast between this case and *Ridley* is instructive. There the defendant transit authority's rationale for rejecting the advertisements was that they advocated the legalization of marijuana, and the head of the authority said bluntly that he would have published the advertisements if they had supported existing marijuana laws. 390 F.3d at 88. Such direct evidence of viewpoint discrimination is lacking here.

Moreover, the transit authority in *Ridley* also claimed, post hoc, it had rejected the advertisements because they might promote marijuana use among juveniles, a risk the court deemed "minimal and, indeed, probably nonexistent." *Id.* Not so here — the sole reason in the record for the advertisements' rejection was that they were political, not commercial (they "advocate[] free speech and do[] not try to sell you a commercial product"), so there is no doubt WMATA's reasons for rejection match the advertisements' actual content.

Finally, the plaintiff in *Ridley* pointed to advertisements promoting alcohol use that were "clearly more appealing to juveniles" than the marijuana legalization advertisements. *Ridley*, 390 F.3d at 88-89. This inconsistent application of the

supposed rules of the forum was strong evidence of viewpoint discrimination. Here, however, AFDI has not even alleged, let alone provided evidence, that WMATA has applied its rules inconsistently.

### ii. Facial viewpoint neutrality

Next, AFDI argues the ban on issue-oriented advertising is facially unconstitutional. The argument, again, is confused, but the main thrust appears to be that WMATA's restrictions favor commercial over noncommercial speech and therefore run afoul of the First Amendment.

We have no trouble rejecting this claim: There is Supreme Court precedent almost directly on point. In *Lehman v. City of Shaker Heights*, the Court confronted a ban on political advertising in streetcars. 418 U.S. 298, 299-300 (1974) (plurality opinion). Four Justices noted that "a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles." *Id.* at 303. They then rejected the argument that banning political advertisements violated the First Amendment, which tracks AFDI's argument here concerning all controversial advertising:

> In these circumstances, the managerial decision to limit car card space to innocuous and less controversial commercial and service oriented advertising does not rise to the dignity of a First Amendment violation. Were we to hold to the contrary, display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require.

*Id.* at 304.

The plurality opinion, in sum, held it was not unconstitutional for a government to ban noncommercial advertising in a place that was not an "open space[], ... meeting hall, park, street corner, or other public thoroughfare." *Id.* at 303. In contemporary terms, it is not facially viewpoint discrimination to ban political advertising in a nonpublic forum. Justice Douglas, concurring in the judgment, emphasized the captive nature of streetcar passengers and the would-be political advertiser's "forced intrusions on their privacy." *Id.* at 307. That point, of course, applies equally to WMATA.

Given the holding in *Lehman*, it is no surprise that other circuits have turned away first amendment challenges to bans on political or noncommercial advertising. *See, e.g.*, *AFDI v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 888, 895 (6th Cir. 2012) (upholding ban on "[p]olitical or political campaign advertising"); *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 974, 980-81 (9th Cir. 1998) (White, Retired Justice) (upholding advertising policy limiting acceptable advertisements to "speech which proposes a commercial transaction"); *Lebron v. Nat'l R.R. Passenger Corp. (Amtrak)*, 69 F.3d 650, 654, 658 (2d. Cir.) (upholding Amtrak's unwritten policy of not allowing political advertising), *opinion amended on denial of reh'g en banc*, 89 F.3d 39 (2d Cir. 1995).

In any event, AFDI's argument makes no sense on its own terms. AFDI points out, as a way of showing WMATA's policy is flawed, that an advertiser could claim its product is the best value, most efficient, or best tasting, but a religious person could not promote his religion as the best, most truthful,

or most charitable. This is a correct description of what is and is not acceptable under WMATA's policy — an advertiser can say whatever it wants about a permissible subject but cannot say anything about an impermissible subject — but this is not viewpoint discrimination; to hold otherwise would, as WMATA points out, erase the distinction between content-based and viewpoint-based restrictions.

AFDI next argues WMATA's policy runs afoul of the Supreme Court's decision in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981). This is silly. The plurality opinion in *Metromedia* said that case "present[ed] the opposite situation from that in *Lehman*," which "turned on [a] unique fact situation[] involving [a] government-created forum[] and ha[d] no application here." *Id.* at 514 n.19. If *Lehman* had no application to *Metromedia*, then it stands to reason that *Metromedia* has no application to this case, which is closely analogous to *Lehman*.

Finally, AFDI complains that the Guidelines are somehow worse than the Moratorium and that it is not clear on what basis WMATA rejected its advertisements. How, asks AFDI, can advertisements advocating free speech not be permitted? AFDI has only itself to blame for any uncertainty as to why its specific advertisements were rejected because it neither included in the record WMATA's communication rejecting the advertisements nor resubmitted the advertisements once the Guidelines were adopted. As it is, all we have in the record before us is Ms. Bowersox's statement that the advertisements were rejected because they "advocate[] free speech and do[] not try to sell you a commercial product." In other words,

WMATA rejected the advertisements because they were political.[6]

### iii. Antireligious speech ban

As noted above, AFDI's briefs also mention Guideline 12, which reads, in its entirety: "Advertisements that promote or oppose any religion, religious practice or belief are prohibited." Though AFDI does not expand much upon what it thinks problematic about Guideline 12, it does gesture toward the idea that Guideline 12 might be an unconstitutional prohibition of religious and antireligious views. In doing so, AFDI mentions obliquely three Supreme Court cases — *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384 (1993); *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995); and *Good News Club v. Milford Central School*, 533 U.S. 98 (2001) — that together might arguably call into question the constitutionality of Guideline 12.

We need not venture into this particular thicket. To begin with, AFDI never mounts a full-on argument that *Lamb's*

---

[6] AFDI also implies in its brief that it has constitutional objections to the open advertising policy WMATA had prior to the Moratorium. It is not clear what those claims might be, and AFDI's complaint appears to bring claims only against the Moratorium itself. Indeed it is a puzzle as to how AFDI could have claims against the pre-Moratorium policy, as its advertisements were rejected pursuant to the Moratorium. In any event, it is not our practice to address so undeveloped an argument. *See, e.g.*, *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work ... a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace" (cleaned up)).

*Chapel*, *Rosenberger*, and *Good News Club* do indeed apply to this case; it only cites them for the general proposition that viewpoint discrimination is unconstitutional. Moreover, AFDI was extremely late in portraying its advertisement as antireligious speech, insofar as it has done so at all. In its complaint, for example, it stated its "advertisements make the point that the First Amendment will not yield to Sharia-adherent Islamists who want to enforce so-called blasphemy laws here in the United States, whether through threats of violence or through the actions of complicit government officials, such as Defendants in this case." When the case was filed, that is, AFDI represented the subject of its advertisements as the Free Speech Clause of the First Amendment. In AFDI's initial motion for summary judgment it made a vague reference to *Rosenberger* but came no closer to presenting its advertisements as religious speech. Indeed, it first and belatedly made this argument, such as it is, in its reply in support of its motion for summary judgment. Implying now that its speech is antireligious speech is a mere characterization of convenience.

Additionally, as far as the record shows, WMATA decided to refuse AFDI's advertisements only because of their political nature. As we said before, AFDI neglected to put in the record the actual communication from WMATA rejecting its proposed advertisements. (This failure of evidence is, of course, entirely attributable to AFDI, as it has the burden of proof.) All we have in the record is the testimony of Ms. Bowersox. When AFDI's counsel asked Ms. Bowersox at her deposition why WMATA rejected the advertisements at issue, she said she "believe[d] that this ad would come under advocacy because it advocates free speech and does not try to sell you a commercial product." "The government's purpose is the controlling consideration" in speech cases, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), and here all we have

is WMATA itself telling us it rejected the advertisements because they were political speech. Guideline 12, therefore, is entirely irrelevant to this appeal, and we express no opinion as to whether it violates the First Amendment. This leaves Guideline 9 as the only Guideline AFDI properly challenges that could apply to its proposed speech.

## B. Reasonableness

We come, at last, to the reasonableness of WMATA's policy limiting access to its nonpublic forum, which "must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius*, 473 U.S. at 809. "The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Id.* at 808. "A regulation is reasonable if it is consistent with the government's legitimate interest in maintaining the property for its dedicated use." *IRI*, 685 F.3d at 1073.

AFDI does not suggest the purpose for the forum is anything other than public transportation; instead, it posits that (1) controversial advertising had not disrupted WMATA's operations prior to AFDI's submission, *see* Appellant's Brief at 44 (noting that "[f]or decades WMATA had displayed controversial, public-issue advertisements" and questioning how any "ad ... would somehow interfere with the operation of WMATA's bus system") and (2) WMATA's objective in selling advertising space must have been revenue maximization, so that losing any revenue by refusing AFDI's advertising was unreasonable.

AFDI's premise is incorrect. As related by Ms. Bowersox in her deposition, before the Moratorium WMATA had been plagued by problems stemming from issue-oriented

advertisements. These problems included complaints from riders, community leaders, and employees; and vandalism, security threats, and the increased administrative burden of evaluating arguably obscene or otherwise unacceptable advertisements. All this testimony is uncontested; there is not the slightest hint in the record that WMATA in fact did not have to deal with these problems. Nor has AFDI contested Ms. Bowersox's assertion that the problems became more acute in the 2010s. In the face of all this, WMATA concluded the game was not worth the candle; better to lose some advertising revenue and avoid having to deal with the controversies they create. This seems eminently reasonable; it might have cut into WMATA's revenues, but it necessarily avoided the complaints, the vandalism, and the security threats that WMATA's open advertising policy had engendered.[7] No reasonable jury could conclude, therefore, that the Moratorium and the Guidelines were not reasonable efforts to avoid controversies engendered by advertising on Metrobuses and at Metro stations.

AFDI also cites two Third Circuit cases to support its position. The first held unreasonable a ban upon noncommercial advertisements in airports. *NAACP v. City of Philadelphia*, 834 F.3d 435 (2016). The City proffered as its objectives for the space "revenue maximization and controversy avoidance," *id.* at 445, but there was no record evidence either of pre-ban controversies or of how the ban could possibly help maximize revenue. *Id.* at 445-46. Here, WMATA has not offered revenue maximization as a

---

[7] Indeed, owing to the deficient state of the record, it is not even clear WMATA lost money because of the restriction; it may have made up in saved staff time and diminished vandalism what it lost in payments for issue-oriented advertisements.

justification, and there is ample record evidence of controversies before the Moratorium.

At issue in the second case was a designated public forum as to which the defendant was effectively engaging in censorship, permitting pro-abortion advertisements while excluding anti-abortion ones. *Christ's Bride Ministries, Inc. v. Se. Penn. Transp. Auth.*, 148 F.3d 242, 255-57 (3d Cir. 1998). Here, of course, we are dealing with a nonpublic forum, and WMATA has not discriminated among issue-oriented advertisements but rather closed the space to all of them.

This does not, however, end our inquiry. In a recent case, the Supreme Court analyzed a Minnesota statute banning voters from wearing a "political badge, political button, or other political insignia" at a polling place. *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1883 (2018). The Court held that portion of the statute unconstitutional because the State failed to draw "a reasonable line." *Id.* at 1888. The statute did not define the term "political," which in the Court's view was simply too broad; the State proffered as a limiting construction the idea that "political" meant "conveying a message about the electoral choices at issue in [the] polling place," but the Court noted this construction introduced line-drawing problems of its own. *Id.* at 1888-89. Indeed, at oral argument the State could not explain with any consistency why, for example, "a shirt displaying a rainbow flag" could be worn for some elections and not for others, or why a shirt displaying the text of the First Amendment was permissible but an identical shirt with the text of the Second Amendment was not. *Id.* at 1891. The crux of the Court's decision was that the State's discretion in enforcing the statute had to be "guided by objective, workable standards." *Id.* Because the unqualified ban on "political" apparel did not provide those standards, it was unreasonable.

At several points in its briefs, AFDI makes something approaching this argument, though it never explicitly argues the Guidelines are unreasonable because they lack objective, workable standards. Instead, AFDI at various points complains the Moratorium and Guidelines are "hopelessly vague", vest WMATA with "unbridled control over the use of the forum", and lack the precise and definite standards necessary to satisfy First Amendment scrutiny. AFDI focuses this attack in particular upon Guideline 9 — the only Guideline it can properly challenge — which bans "[a]dvertisements intended to influence the public regarding an issue on which there are varying opinions."

In essence, AFDI merges two variant, though closely related, Supreme Court doctrines to make this claim. First, the Court has held, repeatedly, that the "danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). Therefore, when government censors control access to a forum, but have no standards to govern their decisions, first amendment freedoms are abridged. *See, e.g.*, *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 756-57 (1988).

Second, the Court has condemned statutes that are too vague to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). It is not entirely clear that the vagueness doctrine applies to the Guidelines, which do not, of course, impose criminal penalties on those whose advertisements are denied. *See, e.g.*, *Bryant v. Gates*, 532 F.3d 888, 893 (D.C. Cir. 2008) (noting "it is not clear whether the vagueness doctrine applies ... at all" to statutes that do not

threaten criminal penalties). In any event, the overlap in analysis between unbridled discretion and vagueness is clear; both doctrines require a court to determine whether a decisionmaker's exercise of discretion in allowing or disallowing speech is based upon objective and clear standards.

To this we can now add a third related inquiry — the inquiry that *Mansky* seems to call for — whether the discretion vested in a government official to permit or prohibit speech is "guided by objective, workable standards." *Mansky*, 138 S. Ct. at 1891. These three seemingly inquiries all pose a single challenge: We must determine whether Guideline 9 is so broad as to provide WMATA with no meaningful constraint upon its exercise of the power to squelch. If so, then it is not "reasonable," as that term is used in *Mansky*, and not constitutional because it provides WMATA with unbridled discretion. Put the other way around, if Guideline 9 is capable of reasoned application, as *Mansky* demands, then it does not confer unbridled discretion upon WMATA.

The parties' briefs predate the decision in *Mansky*. Yet *Mansky* invites arguments about whether Guideline 9 is capable of reasoned application. Moreover, WMATA's defense of the Guidelines against AFDI's unbridled discretion/vagueness challenge was that it banned AFDI's advertisements as "political" speech, which is not unconstitutional. That argument might be unavailing in light of *Mansky*.

In these circumstances, AFDI should be given an opportunity to refine its argument and to supplement the record accordingly. *See, e.g.*, *Belizan v. Hershon*, 495 F.3d 686, 692 (D.C. Cir. 2007) (remanding securities fraud claims to the district court to reconsider in light of intervening Supreme Court precedent). Guideline 9 has been in place for nearly

three years, and information on how it has been applied would certainly be information as to whether it is capable of reasoned application. In addition, the district court may wish to clarify whether WMATA would have rejected AFDI's advertisements based upon Guideline 9 or some other Guideline.

We therefore reverse the grant of summary judgment to WMATA as to whether its policy is reasonable and remand that portion of this case to the district court.

### 3. Fourteenth amendment claim

As we noted at the outset of this opinion, AFDI also brought a claim under the Fourteenth Amendment, asserting that the "speech restriction ... unconstitutionally deprived [AFDI] of the equal protection of the law guaranteed under the Fourteenth Amendment ... in that [WMATA is] preventing [AFDI] from expressing a message based on its content and viewpoint." In support of this claim, AFDI cites *Police Department of Chicago v. Mosley* for the proposition that "under the Equal Protection Clause ... [the] government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." 408 U.S. 92, 96 (1972). In other words, according to AFDI the Equal Protection Clause, like the First Amendment, prohibits the Government from engaging in viewpoint discrimination. As seen above, WMATA did not do that. AFDI does not contend, and *Mosley* does not suggest, that an unreasonable speech restriction violates the Fourteenth, as opposed to the First Amendment. This is fatal to AFDI's Fourteenth Amendment claim.

### III.    Conclusion

WMATA sought to end the controversy over the advertisements displayed in its forum.  It has succeeded in eliminating complaints about the advertisements it accepts, but it has swapped those controversies for numerous lawsuits over the advertisements it rejects.  While it is clear WMATA did not engage in viewpoint discrimination in rejecting AFDI's advertisement and adopting Guideline 9, *Mansky* provides enough uncertainty that it makes sense for the district court to reexamine in the first instance whether WMATA's applicable restrictions are reasonable.    The district court's grant of summary judgment to WMATA is therefore affirmed in part and reversed in part, and the case is remanded to the district court for further proceedings consistent with this opinion.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, dissenting: After the Washington Metropolitan Area Transit Authority (WMATA) rejected the American Freedom Defense Initiative's (AFDI) advertisement under an interim advertising policy (Moratorium), AFDI sued to enjoin that policy. Although WMATA later changed its advertising policy by adopting more specific, lucid and permanent provisions (Guidelines), the litigation posture did not catch up. AFDI never resubmitted its ad to WMATA and therefore WMATA did not reject AFDI's ad under its new permanent policy and has not specified which, if any, of the Guidelines AFDI's ad would violate. AFDI did not amend its complaint to challenge WMATA's Guidelines, which remain in effect today. Although the Guidelines attempt to serve the same goal as the interim policy—banning controversial ads from WMATA's advertising space—WMATA's speech restrictions' applicability to the plaintiff's speech is not clear and their contents changed significantly after the plaintiff sued to enjoin the earlier version. I believe the AFDI's claim for an injunction against the inoperative Moratorium is moot[1] and, accordingly, I respectfully dissent.

---

[1] AFDI also sued for damages under 42 U.S.C. § 1983 but I believe that claim fails. The Supreme Court has held that "neither a State nor its officials acting in their official capacities are 'persons' under [section] 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). This holding applies to "States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." *Id.* at 70. WMATA's general manager as named in the complaint is an "official[] acting in [his] official capacit[y]." *Id.* at 71. And we have held that WMATA is an arm of the state for sovereign immunity purposes. *See Morris v. WMATA*, 781 F.2d 218, 224 (D.C. Cir. 1986) (Maryland and Virginia "conferred their eleventh amendment immunities upon WMATA" by signing compact creating WMATA). Therefore, neither defendant is liable for damages.

We "lack jurisdiction to decide moot cases" because a moot case is no longer an actual case or controversy under Article III. *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983). The basis of mootness is in WMATA's voluntary conduct: changing the Moratorium—under which WMATA rejected AFDI's ad and which is the only policy AFDI challenged in its complaint—to the Guidelines. A defendant's "voluntary cessation of a challenged practice" moots a case if "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks omitted). A claim for prospective relief against a law that is repealed or expired after the claim is initiated may moot the claim. *See Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349–50 (D.C. Cir. 1997). In this case, we do not face a situation in which the government has outright repealed the challenged law with no evidence of intent to reenact it, *see Burke v. Barnes*, 479 U.S. 361, 363–65 (1987), nor do we face a situation in which the government has repealed the challenged law but has expressed an intent to reenact the same law, *see City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n.11 (1982). Instead, we face a situation in the middle of these two poles: the government has replaced the challenged regulation with a new regulation that differs in some respects. I believe three United States Supreme Court cases serve as guideposts.

In *Diffenderfer v. Central Baptist Church of Miami*, a state law "authorize[d] a tax exemption for church property used . . . as a commercial parking lot." 404 U.S. 412, 413 (1972). The plaintiffs sued for an injunction requiring government officials "to assess and collect taxes against such property." *Id.* During litigation, the state repealed the law and enacted a new statute providing that "church property is

exempt from taxation only if the property is used predominantly for religious purposes." *Id.* at 414. The Court noted that the application of the statute to the parking lot in question likely changed and therefore concluded the case was therefore moot. "The only relief sought in the complaint was a declaratory judgment that the now repealed [statute] is unconstitutional as applied to a church parking lot used for commercial purposes and an injunction against its application to said lot. This relief is, of course, inappropriate now that the statute has been repealed." *Id.* at 414–15.

In another case in which the defendant repealed and replaced the challenged policy *pendente lite*, the Supreme Court reached the opposite conclusion. *Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656 (1993). In *Northeastern Florida*, an ordinance required that 10 per cent of the amount spent on city contracts be "set aside" for minority businesses. *Id.* at 658. Non-minority contractors sued, arguing the ordinance violated the Equal Protection Clause and seeking declaratory and injunctive relief. *Id.* at 659. After the Supreme Court granted certiorari, the city repealed the challenged ordinance and "replaced" it with another ordinance that differed in a few minor ways but still treated minorities in certain identical overlapping ways: the first ordinance applied to women and seven minority groups and the second applied to women and blacks only; in addition, the first ordinance used only the "set aside" to achieve the quota but the second ordinance contemplated five possibilities, one of which was a plan that mirrored the "set aside." *Id.* at 660–61. The Court held the case was not moot, *id.* at 663, reasoning that, although the new ordinance "differs in certain respects" from the old ordinance, "insofar as it [duplicates the original law,] it disadvantages" the plaintiffs "in the same fundamental way," *id.* at 662.

A third case illustrates the principle that a significant change in the way a challenged law works can render a case moot. *Fusari v. Steinberg*, 419 U.S. 379 (1975). In *Fusari*, the plaintiffs challenged state procedures for determining continuing eligibility for unemployment compensation. The district court held the scheme violated the plaintiff's due process rights. The state amended the statutes to provide additional procedural protections. The Court held the claim was moot. "Although the precise significance of the amendment to [the law] is unclear," the Court reasoned that the changes "may alter significantly the character of the system considered by the District Court." *Id.* at 386–87; *see also Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 251 F.3d 1007, 1011 (D.C. Cir. 2001) (relying on *Fusari* to dismiss as moot claim against "old set of rules" replaced by "new system").

The resolution of these three cases, the Supreme Court tells us, turns on "whether the new ordinance is sufficiently similar to the repealed ordinance that it is permissible to say that the challenged conduct continues." *Ne. Fla.*, 508 U.S. at 662 n.3 In *Northeastern Florida*, the Supreme Court "believe[d] that the ordinance ha[d] not been sufficiently altered" and thus the claim was not moot. *Id.* (internal quotation marks omitted). In contrast, the "statutes at issue" in *Diffenderfer* and *Fusari* "were changed substantially" and thus the claim was moot. *Id.*

So the question here: how similar are the Moratorium and the Guidelines? WMATA points to a central similarity: the Moratorium prohibited "any and all issue-oriented advertising, including but not limited to, political, religious and advocacy advertising until the end of the calendar year," Joint Appendix (JA) 34, and the Guidelines "resolved" to "close[]" WMATA's advertising space "to issue-oriented ads, including political, religious and advocacy ads," JA 35. WMATA argues the

carryover language means that WMATA's conduct "has not ceased." Appellee's Supp. Br. 5. My colleagues agree with this reasoning. Maj. Op. 8 ("[T]he Moratorium banned issue-oriented advertisements, and so do the Guidelines.").

If that were all the new policy said, I would agree. But WMATA's advertising decisions under the Guidelines are not governed by the language that WMATA relies on. Whereas the prohibition of "issue-oriented . . . political, religious and advocacy" ads was operative in the Moratorium, that same language in the Guidelines is more akin to a preamble or a statement of purpose; WMATA instead effects its intent via five specific inquiries that serve as the operative terms of the Guidelines.[2] *Compare* JA 34 (Moratorium), *with* JA 35

---

[2] As an example of how WMATA uses the November policy, WMATA rejected the Archdiocese of Washington's "Find the Perfect Gift" holiday advertisement under "Guideline 12"—the provision prohibiting advertisements that promote or oppose a religion, religious practice or belief. *Archdiocese of Washington v. WMATA*, No. 1:17-cv-02554 (D.D.C. Nov. 28, 2017), ECF No. 1 ¶ 19 (complaint citing WMATA letter stating it rejected Archdiocese's advertisement under "Guideline 12"); *see id.*, No. 17-7171, slip op. at 7 (D.C. Cir. July 31, 2018) ("When the Archdiocese sought to purchase space for the 'Find the Perfect Gift' ad . . . WMATA declined on the ground that it was impermissible under Guideline 12 'because it depicts a religious scene and thus seeks to promote religion.'"). As another example, WMATA rejected Milo Yiannopoulos's advertisements for his book *Dangerous* under "Guideline 9"—the provision prohibiting ads that are "intended to influence members of the public regarding an issue on which there are varying opinions"—and "Guideline 14"—the provision prohibiting ads that "are intended to influence public policy." *ACLU v. WMATA*, No. 1:17-cv-01598 (D.D.C. Sept. 5, 2017), ECF No. 21, Attachment 1 ¶ 25 (Declaration of Lynn Bowersox, stating ads were rejected under "Guidelines 9 and 14"). For a final example, WMATA rejected an American Civil Liberties

(Resolution to revise Guidelines to prohibit issue-oriented ads), *and* JA 37–38 (Guidelines). Thus, under the Moratorium, WMATA asked: Is this advertisement an "issue-oriented . . . political, religious [or] advocacy" advertisement? Under the Guidelines, however, WMATA asks, *inter alia*: Is this advertisement (1) "intended to influence members of the public regarding an issue on which there are varying opinions"; (2) "support[ing] or oppos[ing] any political party or candidate"; (3) "promot[ing] or oppos[ing] any religion, religious practice or belief"; (4) "support[ing] or oppos[ing] an industry position or industry goal without any direct commercial benefit to the advertiser"; or (5) "intended to influence public policy"?

The two versions ask very different questions. And the textual difference between the Moratorium and the Guidelines is not purely semantic. As WMATA acknowledges, the Guidelines "elaborate" on and "add meaningful content" to the Moratorium's policy. Appellee's Supp. Br. 11 n.5. The Guidelines give contours to the line WMATA draws between what ads to accept and what ads to reject. The new boundaries matter under the First Amendment. *See, e.g.*, *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574–75 (1987) (constitutionality of forum speech restriction turns on construction of government prohibition's text); *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 91–92 (1965) (constitutionality of conviction under ordinance subject to First Amendment challenge differs based on construction of ordinance's text). Although my colleagues believe the Guidelines merely "particulariz[e] and finaliz[e]" the

Union (ACLU) advertisement for its annual conference under Guidelines 9 and 14. *ACLU v. WMATA*, No. 1:17-cv-01598 (D.D.C. May 27, 2018), ECF No. 37, Attachment 1 ¶ 6 (Declaration of Lynn Bowersox, stating ACLU's advertisement for its annual conference was rejected under Guidelines 9 and 14).

Moratorium, Maj. Op. 7, the addition of "meaningful content" to guide government officials' decision-making, Appellee's Supp. Br. 11 n.5, can make all the difference in whether a nonpublic forum speech restriction survives constitutional scrutiny.

A recent United States Supreme Court case illustrates why. A nonpublic forum speech restriction must provide "objective, workable standards" to constrain government officials' "discretion" in deciding what speech comes in and what speech stays out. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018). The Supreme Court stated that "broad[]," "indeterminate" restrictions, *id.* at 1888–89, are more difficult to uphold than narrower, more "lucid" restrictions, *id.* at 1891. For example, the Supreme Court suggested, the First Amendment nonpublic forum "reasonableness" analysis of a law that prohibits wearing "political" apparel likely differs from the analysis of a law that prohibits displaying "information that advocates for or against any candidate." *Id.* (internal quotation marks omitted). Moreover, the Supreme Court noted that state guidance prohibiting "issue oriented material designed to influence or impact voting" is problematic because it "raises more questions than it answers." *Id.* at 1889 (internal quotation marks and brackets omitted). Accordingly, it is possible that the answer to whether a restriction on "issue-oriented" "political" or "religious" or "advocacy" advertisements is viewpoint-neutral and reasonable may differ from the answer to whether a restriction on advertisements that "support or oppose any political party or candidate" or "promote or oppose any religion, religious practice or belief" or "support or oppose an industry position or industry goal without any direct commercial benefit" or attempt to "influence public policy [or] the public regarding an issue on which there are varying opinions" is viewpoint-neutral and reasonable.

The Guidelines, then, do not "differ[] only in some insignificant respect." *Ne. Fla.*, 508 U.S. at 662. They may replicate the Moratorium in spirit. But the Guidelines do not replicate the Moratorium in substance. I believe the "significantly revised" Guidelines "significantly" "alter" the character of the system WMATA uses to assess advertisements, *Fusari*, 419 U.S. at 380, 386, thereby rendering AFDI's claim for injunctive relief against the now-defunct and textually transformed Moratorium moot. *See Princeton Univ. v. Schmid*, 455 U.S. 100, 103 (1982) (dismissing appeal of First Amendment challenge to government campus-speech regulations that were "substantially amended" "while the case was pending on appeal"); *Nat'l Black Police Ass'n*, 108 F.3d at 350 (claim for injunctive relief against campaign contribution limits moot after enactment of new law that significantly raised but did not eliminate contribution limits); *AFDI v. Metro. Transp. Auth.*, 815 F.3d 105, 110 (2d Cir. 2016) (claim for injunctive relief against part of transit authority's advertising restriction moot after transit authority revised restriction and changed basis for rejection because restriction on speech was "consequence of [the transit authority's] new advertising policy, not a relic of its old one").

Not only are the questions WMATA must ask different. We also do not know WMATA's answer. WMATA's general manager answered in a deposition that AFDI's ad qualified as an "advocacy" ad "because it advocated free speech and it does not try to sell you a commercial product." JA 90. Denying AFDI's ad because it is an "advocacy" ad may work under the Moratorium's prohibition on "advocacy" ads. It does not suffice under the Guidelines. The generic restriction on "advocacy" ads is gone from the operative portions of the Guidelines. And WMATA never specified—to AFDI or to us—under which of the particular Guidelines it would reject AFDI's ad. That runs contrary to WMATA's decisions on

accepting or rejecting other ads submitted after the Guidelines were promulgated. *See supra* n.2.

The majority recognizes the lack of "clari[t]y" regarding the specific Guideline WMATA believes bars AFDI's ad from its metro stations and its buses. Maj. Op. 29 (stating that district court on remand "may wish to clarify whether WMATA would have rejected AFDI's advertisements based upon Guideline 9 or some other Guideline").[3] In my view, that uncertainty counsels not remand but dismissal. *See Fusari*, 419 U.S. at 387 (dismissing challenge to law that changed during litigation because Court was "unable meaningfully to assess the issues in this appeal on the present record"); *AFDI*, 815 F.3d at 111 (dismissing plaintiff's claim seeking injunction against transit authority's old advertising policy that changed during litigation and holding that plaintiff "must" challenge new policy through "amended complaint"). Given the absence of WMATA's assessment under the Guidelines and the material changes between the Moratorium and the Guidelines, "we can only speculate how the new system might operate" on the record before us. *Fusari*, 419 U.S. at 388–89. Because I would hold AFDI's claim moot, I respectfully dissent.

---

[3] My colleagues make some of WMATA's decisions for it. *See* Maj. Op. 10–11, 24 (determining that Guidelines 11, 12 and 13 are inapplicable or irrelevant). Although I do not necessarily disagree with their conclusions, I prefer to let WMATA first determine what Guideline justifies restricting AFDI's speech and assess the constitutionality of that determination once it is made.